OPINION
{¶ 1} Defendant-appellant, Adam M. Saleh ("appellant"), appeals the judgment of the Franklin County Court of Common Pleas convicting him of murder, attempted rape, kidnapping, and tampering with evidence. For the following reasons, we affirm.
 {¶ 2} The Franklin County Grand Jury indicted appellant on the following charges: Count 1, aggravated murder based on kidnapping; Count 2, aggravated *Page 2 
murder based on attempted rape; Count 3, aggravated murder based on prior calculation and design; Count 4, kidnapping; Count 5, attempted rape; and Count 6, tampering with evidence. The charges stem from the death of Julie Popovich. The bill of particulars alleged that appellant committed the offenses "[i]n the area of Ledo's Bar * * * and/or location of body in the area of 4940 Smothers Rd."
 {¶ 3} Appellant pleaded not guilty and asserted his right to a jury trial. At trial, plaintiff-appellee, the state of Ohio ("appellee"), established the following. On September 1, 2005, an individual found human skeletal remains behind a shed in a field on Smothers Road in Franklin County, Ohio, near Hoover Reservoir. Surrounding grass was eight to ten inches high, and the body could not be seen from the road. The body's legs were spread apart, and the arms were extended above the head. The skirt on the body was backwards and above the waist, and the underwear on the body was torn. The parties stipulated that this body was Popovich, and the parties stipulated that Popovich died between August 8 and August 14, 2005.
 {¶ 4} Popovich was last seen during the early morning hours of August 12, 2005. On the evening of August 11, 2005, Popovich attended a party at a duplex shared by Nicholas Kuhlman and Mark Skrzydlak. Thereafter, Popovich went to a bar named Ledo's. Appellant also attended the party and went to Ledo's that evening. Popovich and appellant drank alcohol despite being underage. Popovich was wearing the same clothes found on her dead body.
 {¶ 5} Teonna Brooks accompanied Popovich at the party and Ledo's. Brooks testified as follows on appellee's behalf. Brooks and Popovich arrived at Ledo's about *Page 3 
10:30 or 11:00 p.m. Ledo's required identification for admittance. Popovich did not have her identification card, and Brooks allowed Popovich to use her identification. Brooks had a few drinks. Appellant talked with Popovich at Ledo's, but Brooks did not see them kiss or dance together. Between 1:00 and 1:30 a.m., Brooks saw Popovich go to the patio to smoke a cigarette. Brooks never saw Popovich after that, and Brooks left the bar around 2:00 a.m.
 {¶ 6} Brooks learned that Popovich did not go to work the next day. Brooks saw appellant a couple of days later and asked if he had seen Popovich. Appellant indicated that he had not seen her. Appellant said that he left Ledo's to take a friend home, and no one was at the bar when he returned.
 {¶ 7} Justin Rogers was Popovich's boyfriend. Rogers was supposed to pick up Popovich from Ledo's. On the Sunday after Popovich's disappearance, Brooks saw Rogers with a bandage on his hand. Rogers claimed that he had hit a wall.
 {¶ 8} Lila Kimes was also at Ledo's with Popovich and testified as follows. Kimes arrived at Ledo's between midnight and 12:30 a.m. Kimes only had one alcoholic drink at the bar. Popovich was already there and appeared intoxicated. Kimes was introduced to appellant, who was wearing a shell necklace. Appellant and Popovich talked together "pretty much the whole night." (Vol. II Tr. 238.) Popovich and appellant danced and may have kissed. Popovich also danced on the bar. She fell, but appeared uninjured. Later, Kimes saw appellant and Popovich leave the bar. Popovich "looked very intoxicated when she left. * * * She was kind of slouched over [appellant's] shoulder walking out the door because she couldn't really walk very well by herself." (Vol. II Tr. *Page 4 
242.) Kimes thought that Popovich and appellant were going outside to smoke, but Kimes did not see Popovich again. Popovich left shortly before Kimes. At trial, Kimes first said that she left the bar around 1:45 a.m., but later testified that she left the bar around 12:45 and 1:00 a.m. Kimes knew that Rogers was at another bar until it closed at 2:30 a.m.
 {¶ 9} Justin Webb dated Kimes and socialized with the group at Ledo's. Webb testified as follows. Webb did not drink at Ledo's because he was a designated driver for Kimes and her friends. Webb arrived at Ledo's between midnight and 12:30 a.m. Webb saw Popovich, who mostly talked to appellant at the bar. Appellant was wearing a shell necklace. Webb had not seen appellant before, and Webb was not formally introduced to appellant. Popovich danced on the bar, and she fell into boxes or a trash can. She did not appear injured and resumed dancing. Webb saw appellant and Popovich leave Ledo's between 1:15 and 2:00 a.m. Popovich was "pretty intoxicated," and she "was leaning over" appellant as he walked her out the door. (Vol. II Tr. 289.) Webb never saw Popovich again. Webb received a reward from Crimestoppers for leaving a tip about Popovich's death.
 {¶ 10} The prosecutor questioned Kimes and Webb about the police separately showing them photo arrays and asking them to identify the person with whom Popovich left Ledo's. The prosecutor indicated that the person they identified was appellant. Kimes took 20 minutes to make the identification "to be sure." (Vol. II Tr. 262.) Kimes testified that she was 100 percent sure of her identification of appellant as the person who left Ledo's with Popovich. Webb was unable to make an identification during an *Page 5 
initial array because he was not completely sure "and it wasn't a very good picture at the time." (Vol. II Tr. 296.)
 {¶ 11} Byron Hannah testified that he found Brooks' identification near a guardrail by some rocks on the east side of a bridge on Smothers Road on either August 15 or 16, 2005. His girlfriend mailed the identification to Brooks.
 {¶ 12} Columbus Police Detective Patrick Dorn interviewed appellant on August 25, 2005. The recorded interview was shown to the jury. During the interview, appellant stated the following. At the time of Popovich's disappearance, appellant had been to a party at the duplex that Kuhlman and Skrzydlak shared, and appellant had been to Ledo's. Appellant spent time with Popovich at the party and at Ledo's. He recalled that Popovich was drunk at Ledo's. She told him that she fell off the bar, and she complained about pain in her face. He also recalled Popovich talking to another man at Ledo's. This was the last time that appellant saw Popovich. Appellant left Ledo's between 1:00 and 2:00 a.m. to help his mother close a nearby carryout store she operated. Appellant was wearing a shell necklace during the interview, and appellant stated that he always wore it.
 {¶ 13} Dorn testified that, after the interview, appellant agreed to provide fingerprints and oral swabs. According to Dorn, appellant also agreed to leave his car, a Crown Victoria, for examination, but police found nothing incriminating and returned the car to appellant. Dorn testified that a search warrant executed at appellant's apartment yielded no evidence. Dorn testified that police re-searched appellant's car after Popovich's body was found. *Page 6 
 {¶ 14} On cross-examination, defense counsel asked Dorn if he was aware that, before her disappearance, Popovich called a restaurant where her boyfriend worked. Appellee objected. The trial court sustained the objection and noted that Dorn "did not have anything to do with Julie Popovich's phone records." (Vol. II Tr. 417.)
 {¶ 15} T-Mobile records custodian Jonathan Mendillo and T-Mobile cell phone tower engineer Nadir El-Fadli testified and provided exhibits about appellant's cell phone activity during the early morning hours of August 12, 2005. Their testimony and exhibits established the following. At 2:26 a.m., appellant checked his cell phone voice mail. That call lasted up to one minute and registered off of a cell phone tower at a high school on Route 161 West. At 3:42 a.m., appellant received a call, later established to be his mother. That call lasted up to three minutes and registered off of a cell phone tower at 901 Sunbury Road, which was near where Popovich's body was found. At 3:58 a.m., appellant received another call, later established to be his mother. That call lasted up to one minute and registered off of a cell phone tower at 364 West Lane Avenue at Ohio State University. The Lane Avenue cell phone tower is near appellant's apartment. El-Fadli designed and maintains all three of these cell phone towers. El-Fadli opined that appellant was not near Ohio State University when he checked his voicemail at 2:26 a.m. and when he received the 3:42 a.m. call. El-Fadli explained that cell phones generally register to the closest tower, and the maximum range for a cell phone tower in Franklin County is 1.5 to two miles. El-Fadli discounted the possibility that the signals for these calls were transferred from campus cell phone towers due to heavy cell phone activity on campus. *Page 7 
 {¶ 16} Columbus Police Detective Michael McCann testified as follows. McCann confirmed that the initial search of appellant's Crown Victoria yielded no physical evidence. The car was very clean and "obviously was driven by someone who cared" about cars. (Vol. V Tr. 870.) McCann testified that police found no physical evidence when they searched appellant's car another time. Police installed a "ground positioning satellite unit" ("GPS") in appellant's car to monitor appellant's driving. (Vol. V Tr. 874.) The GPS detected appellant traveling at high speeds, with the speed exceeding 100 m.p.h. several times. SWAT officers also followed appellant, and these officers confirmed appellant's speeding.
 {¶ 17} With another officer, McCann drove a route from Ledo's to the site where Popovich's body was found. It was after midnight, and the officers used side streets and observed the speed limit. The distance was 28 miles, and the trip took 33 minutes. On the way back, the officers used a series of freeways to appellant's apartment. Observing the speed limit, the trip took 22 minutes. The officers used another set of freeways from the place where Popovich's body was found to appellant's apartment. Observing the speed limit, the trip took 27 minutes. McCann estimated that there are "20-plus miles" between appellant's apartment and the place where Popovich was found. (Vol. V Tr. 885.) McCann estimated that Popovich's body was found less than five miles from the cell phone tower at 901 Sunbury Road.
 {¶ 18} McCann interviewed Rogers and observed his bandaged hand. McCann knew that Popovich and Rogers were dating and that they had a volatile relationship. McCann knew that Rogers was driving Popovich's car at the time of her disappearance. *Page 8 
 {¶ 19} On cross-examination, McCann testified that police obtained T-Mobile cell phone records registered to James Clayton, a friend and employer of Popovich who lives in Miami. McCann testified that Popovich used the account "for some time." (Vol. V Tr. 899.) McCann testified that police did not recover Popovich's cell phone. Trial counsel suggested to McCann that the phone records establish that Popovich made 20 calls the afternoon and evening of August 12, 2005. McCann disagreed and said that the last outgoing call was approximately 1:00 a.m. that date. Trial counsel showed McCann the phone records and sought to resume questioning. Appellee objected, and the trial court concluded that counsel could not ask McCann about the contents of the records because counsel failed to have the T-mobile records custodian authenticate them.
 {¶ 20} A series of jail informants testified on appellee's behalf. The informants communicated with appellant while he was in jail awaiting trial.
 {¶ 21} Brian Banks shared a cell with appellant and testified that appellant revealed the following. Appellant met a girl named Julie at a club. Julie was drunk and went outside with appellant to get some fresh air. They went to appellant's Crown Victoria, where she resisted his sexual advances. He put his hands on her throat and tried to make her hyperventilate and pass out. He pressed too hard and choked her. She was dead. He put her in his car trunk and went home. The next day he "took her body to the water." (Vol. III Tr. 605.) Appellant told Banks that he dumped Popovich's body so that it would decompose and leave no evidence. Appellant also said that he cleaned his car trunk. Appellant discovered that police put a GPS on his car, but he *Page 9 
removed it. Banks testified that he did not obtain information about Popovich's case from the television news. Banks confirmed that he obtained a bargain with appellee in exchange for his truthful testimony. Banks testified that he was telling the truth.
 {¶ 22} Kendle Mardis also shared a cell with appellant, and Mardis testified that appellant revealed the following. Appellant had left a bar with Popovich, and he "fingered" Popovich's vagina. (Vol. IV Tr. 651.) Appellant threw to the side of the road the identification card that Popovich had. Appellant said that he was driving an Infiniti car at the time of Popovich's disappearance. Appellant was glad that Popovich's body had decomposed, and appellant believed that the body had no evidentiary value. Appellant was concerned that his phone registered off of a cell phone tower in the area where Popovich was found. Appellant was concerned about data that might be retrieved from his cell phone, too. Appellant did not specifically admit to killing Popovich. When Mardis asked if appellant killed Popovich, however, appellant said, "`We jihad know how to get the job done.'" (Vol. IV Tr. 672.) Appellant made a chopping motion and laughed. Appellant asked Mardis to find a woman to set up a false alibi to testify that she was with appellant during the time of Popovich's disappearance. Appellant claimed that his mother was providing a false alibi that placed him at home in bed when Popovich died. Appellant was concerned that his mother may eventually decide not to help him, however, and appellant did not want to get his mother involved. Appellant also discussed paying Mardis to harm witnesses and the prosecutors after Mardis was released. Mardis testified that he did not obtain *Page 10 
information about Popovich's case from the television news. Mardis denied testifying in exchange for a bargain with appellee, and Mardis said that he was telling the truth.
 {¶ 23} Inmate Michael Livsey testified to overhearing the following between appellant and Mardis. Appellant offered to pay Mardis' bond to secure his release so that Mardis could "take care of some witnesses." (Vol. IV Tr. 720.) Appellant expressed worry that the identification card that Popovich had was found near her body. Appellant was glad that Popovich's body had decomposed when found, and appellant admitted to touching Popovich's vagina. Appellant was worried about his cell phone, and appellant commented that people with him when Popovich died were drunk and, therefore, could not remember anything. Livsey also overheard appellant tell Mardis that his mother and friends were lying for him. Livsey testified that, when he overheard appellant's conversation, he had not heard about Popovich's case on the news, but he heard about the case on the news afterward. Livsey verified that he obtained a bargain with appellee in exchange for his truthful testimony. Livsey said that he was telling the truth.
 {¶ 24} Inmate Damien Weatherspoon testified to the following. Appellant told Weatherspoon that he was worried about his case, though he was innocent, because he had been at a bar with the victim, and "`just my luck I was in the same area where her body was found.'" (Vol. IV Tr. 753.) Appellant also told Weatherspoon that his cell phone registered off of a tower in the area where Popovich's body was found. Appellant discussed the police investigation of his car, and appellant bragged "about how the investigator was stupid because that wasn't even the car that he was driving" the night *Page 11 
of Popovich's disappearance. (Vol. IV Tr. 766-67.) Appellant gave Weatherspoon notes revealing his plan to offer the false alibi that he described to Mardis. Appellant also gave Weatherspoon notes that revealed threats to people aiding the prosecution. Weatherspoon admitted to getting a benefit from appellee in exchange for his truthful testimony. Weatherspoon testified that he was being truthful.
 {¶ 25} Inmate Melvin Damron testified to the following. Appellant talked to Damron about Popovich's disappearance. Appellant said that Popovich was "getting stupid, and so he * * * escorted her * * * down some steps and then out and then that is the end of it." (Vol. IV Tr. 780.) Damron said that he did not want to hear anymore because he had a daughter. Before Damron was released from jail, appellant asked Damron to call a particular phone number and leave an anonymous tip that described an individual, not appellant, seen with Popovich near Hoover Reservoir on the date of Popovich's disappearance. Appellant gave Damron a note with details about the individual with whom Damron was to direct suspicion. It was later established at trial that the individual matched the description of Kris Kline, appellant's friend. Damron gave the note to his attorney, and his attorney contacted the police. The note is labeled Exhibit J-2. Damron admitted to entering into a deal with appellee in exchange for his truthful testimony. Damron testified that he was telling the truth.
 {¶ 26} Jeanette Brown, an FBI document examiner, testified that the handwriting on the notes to Weatherspoon and Damron matched appellant's handwriting. Brown testified that she compiled Exhibit D-2, which showed that appellant "prepared *Page 12 
comparable portions" of the letter to Mardis. The name "Adam" is on the authorship line. The author says that he has "[B]randy's story ready." (Exhibit V.)
 {¶ 27} Larry Smith, who knew appellant from school, testified as follows. Appellant drove very fast and kept his cars clean. One car that appellant drove had large speakers in the trunk that took up much of the space. Larry Smith's uncle lived about 100 yards from the location where Popovich was found. Appellant had been to that house at least twice. Larry Smith talked to appellant during the day on August 12, 2005, and they met at a race track that evening to race cars. Appellant appeared normal then and through the following weeks.
 {¶ 28} Dr. Jan Gorniak from the coroner's office ruled Popovich's death a homicide, but she could not determine the immediate cause of death because the body was too decomposed. However, Dr. Gorniak testified that medical history, the position of Popovich's body when found, and the lack of signs of blunt force trauma or penetrating injuries suggested strangulation or smothering as the cause of death. Dr. Gorniak answered questions about whether Popovich suffered fatal injuries from her fall at Ledo's. Dr. Gorniak testified that Popovich did not have a fractured skull and that, if Popovich died from a head injury, there would have been either a skull fracture or she would have complained of pain, headache, and dizziness.
 {¶ 29} Appellee rested its case, and the defense moved for an acquittal. The trial court denied the motion.
 {¶ 30} Kuhlman testified as follows on appellant's behalf. The August 2005 party at his duplex lasted until 10:00 or 11:00 p.m., when the group went to Ledo's. Kuhlman *Page 13 
was at Ledo's until midnight. He saw appellant and Popovich at the bar, but he could not recall specifics of any interaction between them. Popovich fell from the bar just before he left. Kuhlman drank alcohol at the party at his duplex, and he stated that "[w]e were drinking a lot." (Vol. V Tr. 989.) Skrzydlak was also drinking alcohol. Kris Kline drank with the group, too. Kline appeared drunk.
 {¶ 31} Skrzydlak testified as follows on appellant's behalf. He saw Popovich and appellant at Ledo's. Appellant may have danced with Popovich, and appellant claimed to have kissed Popovich at the bar. Appellant left the bar alone. Appellant left approximately 30 to 45 minutes after Kuhlman left, and no later than 1:15 or 1:20 a.m. Skrzydlak saw Popovich fall off the bar. After the fall, Skrzydlak asked Popovich how she was getting home. Popovich said her boyfriend was going to pick her up and take her home. Skrzydlak had not seen Popovich after she fell from the bar. Skrzydlak left Ledo's between 2:00 and 2:15 a.m. Skrzydlak had consumed alcohol, and he was "pretty intoxicated." (Vol. V Tr. 1025.)
 {¶ 32} Charles Graves testified as follows on appellant's behalf. Graves was at the party at the duplex and rode with appellant to Ledo's. Appellant interacted with Popovich at Ledo's, and Graves did not see either of them leave the bar. On cross-examination, Graves acknowledged telling a defense investigator that he saw appellant and Popovich dance, and possibly kiss, though his memory was sketchy due to the passage of time and because he was highly intoxicated at the bar.
 {¶ 33} Tiffany Fulghum testified as follows on appellant's behalf. Fulghum was at Ledo's with Popovich. She danced with Popovich. Later, Popovich went to the patio to *Page 14 
smoke, and Fulghum went to the restroom. She did not see Popovich again. She saw appellant at Ledo's, but could not say whether appellant went to the patio. On cross-examination, Fulghum admitted that her memory was sketchy due to the passage of time and because she was highly intoxicated at the bar.
 {¶ 34} Kristopher Kline was at the duplex party and Ledo's. He testified as follows on appellant's behalf. Kline, appellant, and Skrzydlak spent most of the evening on the patio at Ledo's. Kline did not see appellant spending time with Popovich at Ledo's. Kline last saw appellant at approximately 1:30 a.m., when they left Ledo's together. Brooks left at that time, too. Appellant said he was going home to "pass out" because he was tired. (Vol. VI Tr. 1122.) Kline walked around Ledo's before leaving and did not see Popovich. At most, Kline had had seven beers, and Kline did not believe that he "was beyond a reasonable mind" at that time. (Vol. VI Tr. 1134.) Kline was "absolutely clear" that appellant did not leave Ledo's with Popovich. (Vol. VI Tr. 1143.) Appellant drove a Crown Victoria on August 11 and 12, 2005. Kline confirmed that the note labeled Exhibit J-2 described his height and features, and the note described Kline's car and the location of his home at the time of Popovich's disappearance.
 {¶ 35} Appellant's mother, Fadia Khatib, testified as follows. Khatib worked at the R-1 Carryout. When appellant came by the carryout between 9:00 and 9:30 p.m. on the evening of August 11, 2005, the man who operated the pizza shop next door asked him to go to a grocery store for plates. After that, appellant went to a friend's house and later to Ledo's. Khatib called appellant's cell phone around 1:00 a.m., but appellant did *Page 15 
not answer. Appellant came to the carryout a short time later. He was not "driving crazy." (Vol. VII Tr. 1378.)
 {¶ 36} Khatib noticed a supercharger on the seat of appellant's Crown Victoria. A supercharger "gives * * * added power to the car." (Vol. VI Tr. 1317.) Khatib did not want appellant to use the supercharger because he had ruined a lot of other cars with it. Khatib smelled alcohol on appellant's breath and took appellant's car keys. Thereafter, appellant walked home, which was one block from the carryout. Khatib went home around 2:00 a.m. and saw that appellant had vomited. She went to a nearby coffee shop where she went almost every night after closing the carryout. She called appellant at 3:42 and 3:58 a.m. to see if he wanted a sandwich. Appellant answered the phone both times and spoke with her. She looked into appellant's room when she got home around 4:00 a.m. He was sleeping.
 {¶ 37} Khatib admitted to not telling investigators that she took appellant's keys and that appellant was home sick at the time of Popovich's disappearance. Likewise, Khatib admitted that she provided different testimony to the grand jury.
 {¶ 38} Bruce Benis operated the pizza shop next to the R-1 Carryout. Benis testified as follows on appellant's behalf. During August 11 and 12, 2005, Benis was outside of his shop selling pizza to people leaving the bars. Benis saw appellant, and Benis asked appellant to go to a grocery store to buy paper plates and napkins. This occurred between 8:30 and 9:30 p.m. Between 1:30 and 2:00 a.m., Benis saw appellant engage in "crazy driving," which included appellant squealing his tires. (Vol. V Tr. 1069.) Benis last saw appellant between 2:00 and 2:30 a.m. when his mother *Page 16 
bought pizza for him. On cross-examination, over objection, appellee elicited testimony from Benis about his father being a criminal defense lawyer who represented appellant at arraignment. Appellee also confronted Benis with his previous statement to police that indicated that events he described at trial took place on a different night. Benis stated that he was 100 percent sure that the events he described at trial took place at the time of Popovich's disappearance.
 {¶ 39} James Ferguson helped Benis at the pizza shop and testified as follows on appellant's behalf. Ferguson talked with appellant on August 11 and 12, 2005, between 8:30 and 9:30 p.m. and between 12:30 and 1:15 a.m. Benis told Ferguson that appellant had been to the store to buy supplies. Ferguson remembered the time of these incidents because not long afterward missing person flyers went up in the neighborhood.
 {¶ 40} Todd Smith, a private investigator for the defense, testified as follows. Todd Smith traveled the distance between the Lane Avenue cell phone tower and the place where Popovich's body was found. That distance was 18.1 miles and took 40 minutes to drive. Todd Smith chose a route that he believed the quickest. The drive occurred around 3:00 and 4:00 p.m. It was rush hour, the route involved a busy intersection, and Todd Smith drove the speed limit. He did not test alternative routes, and he did not test the route at 3:00 a.m. The cell phone tower at 901 Sunbury Road was 4.1 miles from the place where Popovich's body was found, and another cell phone tower was on Harlem Road, which was 1.3 miles from the place where Popovich's body was found. *Page 17 
 {¶ 41} Cell phone expert Ben Levitan reviewed the case for the defense. Unlike El-Fadli, Levitan did not have an engineering degree. However, Levitan worked for 25 years in the communications industry and had been involved in establishing standards for cell phone networks.
 {¶ 42} During a voir dire of Levitan, appellee objected to the expert's exhibit that claimed that three calls were made on Popovich's phone on August 12, 2005, to a Los Angeles number at 12:57 a.m., 12:58 a.m., and 12:59 a.m., and to a restaurant at 1:16 a.m. The trial court sustained the objection because the exhibit was based on phone records not in evidence. Moreover, during voir dire, Levitan explained exhibits that surmised that (1) Popovich's phone was used in Miami on August 12, 2005, starting at 9:00 a.m., and (2) 20 calls from Miami were made on Popovich's phone. The trial court did not allow the exhibit because it was based on phone records not in evidence.
 {¶ 43} During direct examination, Levitan opined that appellant's cell phone activity at 2:26, 3:42, and 3:58 a.m. took place near Ohio State University campus, even though the first two calls registered on cell phone towers off campus. Levitan noted that cell phone signals can reach towers beyond two miles, and Levitan explained that heavy cell phone use in an area can cause cell phone signals to transfer to towers that are not the closest to the cell phone. Thus, Levitan opined that a person could be in one location and register on the cell phone towers at Lane Avenue, Route 161, and Sunbury Road. Next, Levitan focused on the 3:42 and 3:58 a.m. calls that registered off the Sunbury Road and Lane Avenue towers respectively. Levitan sought to discredit El-Fadli's conclusion that appellant was within two miles of the Sunbury Road cell phone *Page 18 
tower at 3:42 a.m. Levitan testified that, to accept this conclusion, one would have to conclude that appellant drove 18.4 miles from the Sunbury Road tower to the Lane Avenue tower between 79 and 85 m.p.h. Furthermore, Levitan recognized that the Sunbury Road tower is 4.1 miles from where Popovich's body was found, and the Harlem Road tower is 1.3 miles from where the body was found. Levitan concluded that, if appellant was near Popovich's body at 3:42 a.m., his phone would have registered on the Harlem Road tower. Levitan testified that, if at 3:42 a.m., appellant was driving from the location of Popovich's body toward the Sunbury Road tower, circumstances existed to block a signal from that tower. These circumstances included the following: (1) the Sunbury Road tower having radios that faced Ohio State University and not Hoover Reservoir; (2) the tower having close proximity to another company's cell phone tower; and (3) power lines that would have blocked signals. Later, Levitan clarified that if appellant was driving down Sunbury Road from the eastern side of the tower, "[y]ou may have gotten a call, but it probably wouldn't have been a good call." (Vol. VII Tr. 1596-97.) Additionally, Levitan noted that cellular systems require constant maintenance and alterations to maintain optimal operation. Thus, Levitan opined that T-Mobile representatives cannot properly testify about previous cell phone tower use at the time of Popovich's disappearance, that records suggest that the Sunbury Road tower did not exist at the time of Popovich's disappearance. Levitan also testified that he did not receive call detail records, which would have described cell phone tower activity and the sector of a tower that a cell phone hit. *Page 19 
 {¶ 44} On cross-examination, Levitan admitted that he was not familiar with Columbus, and he could not specify the location of the Ohio State University area. The prosecutor criticized Levitan for talking with counsel during a break from his testimony. The prosecutor suggested that it was inappropriate for Levitan to talk with counsel during the break, and Levitan said, "I don't know that, sir. I'm not a lawyer." (Vol. VII Tr. 1535.) The prosecutor also accused Levitan of suggesting questions for the defense to ask. Levitan denied the allegation. Levitan testified that counsel "showed me a document that he was going to present to me, and he asked me if I had it in my pile, and I said yes, I did." (Vol. VII Tr. 1534.) The prosecutor noted that, when he confronted Levitan and counsel during the break, Levitan lied and said that he and counsel were talking about counsel's granddaughter. He also noted that, during this confrontation, appellant's stepfather approached and removed Levitan. Levitan disputed this, however, and said that the prosecutor and appellant's stepfather started to argue, and Levitan left because he did not want to be involved. The prosecutor asked Levitan about buying candy from appellant's stepfather at the R-1 Carryout when Levitan was investigating appellant's case. Levitan said that he did not know that the person was appellant's stepfather at the time. The prosecutor also suggested that Levitan discussed his opinions with appellant's stepfather in the middle of trial. The prosecutor noted that Levitan and appellant's stepfather were behind closed doors in a conference room. Levitan admitted that appellant's stepfather was looking over paperwork, but Levitan denied sharing his views with appellant's stepfather. *Page 20 
 {¶ 45} The prosecutor criticized Levitan for not discussing his opinions with the prosecution. Levitan explained that he had not yet formed his opinions when the prosecutor wanted to talk. Levitan said that he did not form his opinion until after opening statements and a week of testimony and after having been on the case for eight months. The prosecutor also claimed that Levitan had a personal stake in appellant's acquittal because he could brag about the victory on the website that advertised his services. The prosecutor noted that Levitan's website mentions some of his accomplishments from other cases. Levitan replied that he had "not personally reviewed this website in a little while." (Vol. VII Tr. 1552.) Levitan also said: "I have some very significant clients that I would like to put on that website, but I have an agreement that I won't mention their names." (Vol. VII Tr. 1553.)
 {¶ 46} The prosecutor focused on Levitan not obtaining a college degree. Levitan mentioned that he was working toward one, and he interjected that we are all students in some manner. The prosecutor responded: "Well, we are not all posing to be experts in cellular communication, are we?" (Vol. VII Tr. 1536.) At one point during the cross-examination, the trial court admonished Levitan to stop interjecting "editorial comments," and Levitan stated that it felt like he was undergoing a personal attack. (Vol. VII Tr. 1577.)
 {¶ 47} Earlier, the trial court had expressed frustration that expert reports had not been exchanged before trial. The trial court stated that the reports are "normally exchanged weeks or months ahead of time so that both sides know exactly what's coming and exactly what they can expect." (Vol. VI Tr. 1310-11.) *Page 21 
 {¶ 48} Appellant testified at trial and denied killing Popovich or having anything to do with her disappearance. Appellant testified that he had a Crown Victoria in August 2005 and did not have access to any other cars. Appellant testified that, due to his car speakers, he only has about a foot and a half of accessible room in the trunk.
 {¶ 49} Appellant testified as follows about events of August 11 and 12, 2005. Appellant left for the party at the duplex around 8:00 p.m. He went to his mother's carryout to tell her where he would be. Popovich was at the party when he arrived at 9:00 p.m. He drank vodka at the party so that his mother would not be able to detect that he had been drinking. He felt sober enough to drive to Ledo's between 10:30 and 11:00 p.m. He went to his mother's store on the way to pick up his identification and bank cards.
 {¶ 50} Appellant drank beer and liquor at Ledo's. He mostly spent time with Ryan Flannery, Skrzydlak, Kline, and Kuhlman. He danced with Chloe Fritchen, whom he had been dating. He may have been "bobbing around" the same area as Popovich, but he did not dance with her one-on-one or have more than passing interaction with her. (Vol. VIII Tr. 1668.)
 {¶ 51} Appellant's mother wanted him home at 1:00 a.m. Appellant left Ledo's between 1:20 and 1:30 a.m. He walked out with a group of friends. Appellant went to his mother's store. Appellant denied driving erratically in front of his mother's store at that time.
 {¶ 52} Benis was outside next door selling pizza and asked appellant to go to a grocery store to purchase napkins and plates. Appellant drove to the grocery store to *Page 22 
buy the requested items. Thereafter, appellant's mother was unhappy when she spotted a supercharger on the back seat of his car. She was also unhappy about smelling alcohol on his breath. She took his keys and parked the car across the street.
 {¶ 53} Appellant took home a pizza from Benis' shop. At home, he felt sick and vomited. He went to bed around 2:30 a.m. Later, his mother called twice from a nearby café to see if he wanted her to bring him something to eat. He went to work the following day and to a race track that next evening.
 {¶ 54} On cross-examination, appellant testified that a grown man can fit in the back seat of his car. Appellant confirmed that, at 2:26 a.m., he checked his cell phone voice mail and that his mother called at 3:42 and 3:58 a.m. Appellant denied talking about his case with Banks, Mardis, Weatherspoon or Damron, and appellant suggested that they obtained their information from the extensive news coverage. Appellant admitted to meeting a woman who came to visit him with Mardis, but appellant testified that he did not ask her to provide an alibi. Appellant denied writing the notes handed over by Weatherspoon. Appellant admitted to writing the letter to Damron, but appellant denied that the letter meant to draw suspicion on Kline. Appellant claimed that the description in the letter matched a description of a person he heard about on the news. Over objection based on a discovery issue, the prosecutor confronted appellant about a taped interview in which he said he left Ledo's alone, though adding "my friends seen me." (Vol. VIII Tr. 1687.) Over objection, the prosecutor asked appellant if he wrote the letter to Mardis labeled Exhibit V, and appellant denied writing the letter. The prosecutor then asked: "So if the FBI examiner, Jeanette Brown, said that is your *Page 23 
writing, she is just wrong?" (Vol. VIII Tr. 1717.) Appellant responded, "Yes, sir." (Vol. VIII Tr. 1717.) Also over objection, the prosecutor read the letter to the jury.
 {¶ 55} Appellant never told police that he was home sick after Ledo's and that his mother took his car keys. Appellant could not explain why he would have checked his cell phone voice mail at 2:26 a.m. in the midst of vomiting and feeling ill.
 {¶ 56} Appellant acknowledged that he took the GPS off of his car once he discovered it. Appellant admitted that it was unusual that Banks knew about the GPS. Appellant admitted to fast driving habits, and appellant noted that he raced cars.
 {¶ 57} On rebuttal, inmate Leonard Roy testified. Roy testified that appellant wrote him letters requesting that Roy's girlfriend provide appellant a false alibi. Appellant had denied writing the letters during his testimony. Roy verified that he received benefits from the prosecution in exchange for his cooperation. Roy said that he had to testify truthfully to obtain the benefits, and Roy testified that he was telling the truth.
 {¶ 58} Columbus Police Officer Caroline Castro testified on rebuttal. Castro posed as Mardis' girlfriend, Brandy Alexander, and she met appellant twice at the jail and spoke with him over the telephone. Appellant wanted Castro to provide a false alibi by claiming that they were together at the time of Popovich's disappearance.
 {¶ 59} El-Fadli confirmed on rebuttal that the Sunbury Road tower did exist at the time of Popovich's disappearance. El-Fadli testified that there is no way that appellant was at his apartment when his cell phone registered off the Sunbury Road tower. El-Fadli reiterated that a cell phone would be within the two-mile range of the cell phone *Page 24 
tower. El-Fadli testified that, when he made his opinions, he had adequate information about the cell phone tower activity connected with appellant's phone at the time of Popovich's disappearance.
 {¶ 60} During closing argument, appellee argued:
 How do we know what happened that night?
 [W]e did find the body, * * * her skirt was on backwards. What does that tell you * * *? It tells you she was sexually assaulted. It tells you that someone, [appellant], was trying to have sex with her, * * * that he put his finger inside her, he tried to get her clothes off, he pulled her underwear apart to where it was torn, ripped. And what does that comport with? Exactly what Brian Banks told you.
 * * *
 [Popovich] was spread-eagled. The State can't tell you if he sexually assaulted her in the car or if he took her to Smothers Road and had her out there spread-eagled trying to assault her there, she won't comply there so he choked her there. * * * [T]hat was unusual to find her spread-eagled, her hands above her head, her skirt turned around, her underwear torn. That's how we know it was a homicide. We don't need to prove where it was. We just need to prove that he did it.
(Vol. IX Tr. 1973-74.)
 {¶ 61} Thereafter, the defense renewed the motion for acquittal. The trial court denied the motion.
 {¶ 62} The jury found appellant not guilty of the aggravated murder counts based on the predicate offenses of kidnapping and attempted rape, but the jury found appellant guilty of the lesser-included offenses of murder based on these predicate offenses. The jury found appellant not guilty of aggravated murder premised on prior *Page 25 
calculation and design. The jury found appellant guilty of attempted rape, kidnapping, and tampering with evidence.
 {¶ 63} The trial court merged the murder based on attempted rape into the murder based on kidnapping, and the court sentenced appellant to 15 years to life imprisonment on the merged count. The court imposed ten, eight, and five years of imprisonment on the kidnapping, attempted rape, and tampering with evidence counts, respectively. The court ordered appellant to serve the sentences consecutively.
 {¶ 64} Appellant appeals, raising seven assignments of error:
 [I.] Prosecutorial misconduct denied appellant a fair trial.
 [II.] Trial counsel's failure to authenticate the victim's cell phone records, and to make timely objections during cross-examination of the defense expert, denied appellant his Sixth Amendment right to the effective assistance of counsel.
 [III.] As to all counts, the evidence was insufficient as a matter of law to identify appellant as the person who proximately caused the death of the victim.
 [IV.] With respect to the tampering with evidence count, the evidence was legally insufficient to establish appellant altered, destroyed, concealed, or removed any record, document, or thing, with purpose to impair its value or availability as evidence in an investigation.
 [V.] The court erroneously overruled appellant's motions for acquittal pursuant to Criminal Rule 29.
 [VI.] Appellant's conviction was against the manifest weight of the evidence.
 [VII.] Kidnapping, as charged in count four of the indictment, and attempted rape, as charged in count five, are allied offenses of similar import committed with a single animus. *Page 26 
The court erred by imposing consecutive sentences for the two offenses when it should have directed the prosecutor to elect on which offense conviction would be entered and sentence pronounced. Furthermore, imposition of consecutive sentences violated the constitutional ban against double jeopardy.
 {¶ 65} In his first assignment of error, appellant argues that prosecutorial misconduct denied him a fair trial. We disagree.
 {¶ 66} The test for prosecutorial misconduct is, first, whether the conduct is improper, and second, whether the conduct prejudicially affected the substantial rights of the accused. State v. White,82 Ohio St.3d 16, 22, 1998-Ohio-363; City of Columbus v. Rano, 10th Dist. No. 08AP-30, 2009-Ohio-578, ¶ 21. The prosecutor's conduct cannot be grounds for a new trial unless the conduct deprives the defendant of a fair trial. State v. Keenan (1993), 66 Ohio St.3d 402, 405. In considering prejudice, we must consider the following factors: (1) the nature of the remarks; (2) whether counsel objected; (3) whether the court gave corrective instructions; and (4) the strength of the evidence against the defendant. State v. Tyler, 10th Dist. No. 05AP-989, 2006-Ohio-6896, ¶ 20.
 {¶ 67} Appellant argues that appellee committed prosecutorial misconduct when, over objection, it questioned Benis about his father being a criminal defense attorney who represented appellant at arraignment. Appellee asked this question to expose Benis' possible bias, however. An adverse party may cross-examine a witness to show possible bias. State v. Braxton (1995), 102 Ohio App.3d 28, 38. *Page 27 
 {¶ 68} Appellant also argues that the prosecutor committed prosecutorial misconduct when cross-examining Levitan. Appellant contends that the prosecutor improperly criticized Levitan for talking with counsel during a break from his testimony. Appellant did not object to this questioning. Therefore, appellant forfeited the issue, and the plain error standard applies. See State v. Williams, 79 Ohio St.3d 1,12, 1997-Ohio-407 ("Williams I") (applying the plain error standard to a prosecutorial misconduct claim). See also Crim. R. 52(B) (stating that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court"). Plain error exists when there is error, the error is an obvious defect in the trial proceedings, and the error affects substantial rights. State v.Barnes, 94 Ohio St.3d 21, 27, 2002-Ohio-68. A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. Id. Prosecutorial misconduct allows for a reversal under the plain error standard if it is clear that the defendant would not have been convicted in the absence of the improper conduct. See State v. Tumbleson (1995),105 Ohio App.3d 693, 700.
 {¶ 69} The trial court issued a witness separation order, which precludes witnesses from hearing the testimony of others. Evid. R. 615. A separation order violation does not occur solely from evidence of an attorney conferencing with his or her witnesses. See State v.Lanier (Aug. 27, 1999), 2d Dist. No. 98-CA-103. Thus, it was improper for the prosecutor to label the conference between Levitan and defense counsel inappropriate just because they spoke during a break from testimony. *Page 28 
Regardless, under plain error, we find no prosecutorial misconduct because this conduct was minimal, and Levitan negated prejudice when he denied any wrongdoing.
 {¶ 70} Appellant argues that the prosecutor committed prosecutorial misconduct by criticizing Levitan for not sharing his expert opinion before his testimony and for noting that Levitan lied to the prosecution during a break from his testimony. We apply the plain error standard because appellant did not object to the questioning. Williams I, at 12. Although Levitan claimed that he had not formed an opinion when prosecutors asked to talk with him, his conduct appeared evasive. Levitan's evasiveness was atypical, and the trial court had expressed frustration that expert reports had not been exchanged before trial. It was not improper for the prosecutor to question Levitan about his evasiveness and his lie because the conduct suggests hostility and bias against appellee. The trial court's admonition to Levitan against interjecting "editorial comments" during cross-examination lends further support. See United States v. Abel (1984), 469 U.S. 45, 52,105 S.Ct. 465, 469 (recognizing that a witness' like or dislike of a party may induce bias). See also State v. Hilty (Oct. 19, 1990), 11th Dist. No. 89-T-4204 (stating that a witness' personal ill-will against a party is evidence of bias, and this fact may be elicited on cross-examination). Under plain error, we find no prosecutorial misconduct from this questioning.
 {¶ 71} Appellant also argues that the prosecutor committed misconduct by claiming that Levitan acted improperly by talking about the case with appellant's stepfather. Levitan denied discussing his views of the case with appellant's stepfather, but Levitan admitted that appellant's stepfather was looking over some paperwork. *Page 29 
Appellant also argues that the prosecutor committed misconduct by questioning Levitan about buying candy from appellant's stepfather at the R-1 Carryout and about appellant's stepfather intervening during the confrontation outside the courtroom that involved Levitan and counsel. We apply plain error because appellant did not object to this questioning. Williams I, at 12. Through these questions, the prosecutor sought to highlight that Levitan was cooperative and affable with appellant's stepfather, but evasive toward the prosecution. This questioning suggested a bias against the prosecution. See Abel,469 U.S. at 52, 105 S.Ct. at 469. Under plain error, we find no prosecutorial misconduct from this questioning.
 {¶ 72} Appellant also argues that prosecutorial misconduct occurred when the prosecutor asked Levitan if he had an interest in the outcome of appellant's trial so that he could brag about it on his website. We apply plain error because appellant did not object to this questioning.Williams I, at 12. When the prosecutor noted that Levitan's website mentioned past accomplishments in other cases, Levitan did not deny the claim outright. It was proper for the prosecutor to highlight the opportunity Levitan would have to mention a victory in appellant's case. This suggests Levitan's interest in the outcome of appellant's case, and an interest in the outcome of a case indicates bias. See Hilty; State v.Young (Apr. 8, 1982), 8th Dist. No. 43881. Under plain error, we find no prosecutorial misconduct from this questioning.
 {¶ 73} Appellant argues that prosecutorial misconduct occurred when the prosecutor commented during Levitan's cross-examination, "Well, we are not all posing to be experts in cellular communication, are we?" (Vol. VII Tr. 1536.) We apply plain *Page 30 
error because appellant did not object to this comment. Williams I, at 12. While the comment was argumentative and unnecessary, it was fleeting and did not permeate or impact the trial, however. Under plain error, we find no prosecutorial misconduct from the comment.
 {¶ 74} Lastly, appellant argues that the prosecutor committed prosecutorial misconduct when he questioned appellant about the letter to Mardis. Appellant asserts that appellee lacked proper foundation (1) to question appellant about the letter, and (2) to state during appellant's direct examination that Brown verified that appellant wrote the letter. Appellant contends that the letter, marked Exhibit V, was neither identified by Brown nor admitted into evidence. However, Brown verified that she compiled Exhibit D-2, and in that exhibit, Brown found that appellant prepared "comparable portions" of a document that the FBI labeled Q32, which appellee labeled Exhibit V. Although the trial court did not formally admit Exhibit V into evidence at the close of appellee's case-in-chief, the trial court effectively admitted the letter when it allowed appellee to read its contents to the jury. Thus, the prosecutor did not commit prosecutorial misconduct when he questioned appellant about the letter. Having rejected appellant's other prosecutorial misconduct arguments, we overrule appellant's first assignment of error.
 {¶ 75} In his second assignment of error, appellant argues that his trial counsel rendered ineffective assistance. We disagree. The United States Supreme Court established a two-pronged test for ineffective assistance of counsel. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance *Page 31 
and, therefore, deficient. Id., 466 U.S. at 687, 104 S.Ct. at 2064. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. Id. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.,466 U.S. at 694, 104 S.Ct. at 2068.
 {¶ 76} A properly licensed attorney is presumed competent. State v.Samatar, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 88, citing Vaughn v.Maxwell (1965), 2 Ohio St.2d 299, 301. Moreover, there is "`a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Bradley (1989),42 Ohio St.3d 136, 142, quoting Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. In matters regarding trial strategy, we will generally defer to defense counsel's judgment. State v. Carter, 72 Ohio St.3d 545, 558,1995-Ohio-104. See also State v. Carpenter (1996), 116 Ohio App.3d 615,626, citing Bradley, at 144 (holding that we are to "presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of tactical decisions and do not constitute ineffective assistance"). We will only reverse on trial strategy grounds if defense counsel's strategy deviated from the standard of reasonableness.State v. Burgins (1988), 44 Ohio App.3d 158, 160; State v. Newsome, 11th Dist. No. 2003-A-0076, 2005-Ohio-3775, ¶ 8.
 {¶ 77} Appellant argues that trial counsel was ineffective in failing to have T-Mobile records custodian Mendillo authenticate cell phone records of an account that *Page 32 
Popovich used and that was registered to her friend and employer, Clayton, who lived in Miami. The records were inadmissible without the authentication. Evid. R. 803(6); Evid. R. 901. Appellant contends that the records would have exonerated appellant. Appellant argues that great exculpatory value would have stemmed from evidence in the phone records that Popovich called her boyfriend's workplace after she was said to have left the bar with appellant. Appellant also asserts that the evidence in the records that Popovich used her cell phone in Miami during the day on August 12, 2005, establishes that appellant did not kill her because appellant was seen in Ohio that day and evening.
 {¶ 78} McCann's testimony negates appellant's argument because he testified that the cell phone records establish that Popovich's last outgoing call was approximately 1:00 a.m. on August 12, 2005. Moreover, the records are not part of the appellate record, and we cannot speculate that the records contain appellant's purported information. See State v. Kowalsky, 7th Dist. No. 856, 2002-Ohio-3042, ¶ 12;State v. Otte, 74 Ohio St.3d 555, 565-66, 1996-Ohio-108. Moreover, no one testified what, if any, cell phone Popovich had on August 11 and 12, 2005, and Popovich's cell phone was not found. Appellant speculates that the cell phone records registered to Clayton correspond with the phone that Popovich had at the time of her disappearance. Given this speculation, appellant's ineffectiveness claim is unavailing.Kowalsky, at ¶ 12; Otte, at 565-66.
 {¶ 79} Next, appellant argues that trial counsel was ineffective for failing to object to prosecutorial misconduct during Levitan's cross-examination. We have rejected *Page 33 
these prosecutorial misconduct arguments, and we also reject appellant's related ineffective assistance claim. Having rejected appellant's ineffective assistance arguments, we overrule appellant's second assignment of error.
 {¶ 80} We next address appellant's third and fourth assignments of error together. In these assignments, appellant argues that his convictions are based on insufficient evidence. We disagree.
 {¶ 81} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. Jenks at 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, paragraph two of the syllabus;Yarbrough at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim);State v. Lockhart (Aug. 7, 2001), 10th Dist. No. 00AP-1138. *Page 34 
 {¶ 82} Appellant first argues that the evidence was insufficient to identify him as the person who committed murder, attempted rape, and kidnapping against Popovich. We disagree.
 {¶ 83} Webb and Kimes were with Popovich at Ledo's before her disappearance, and these witnesses testified that, during the early morning hours of August 12, 2005, appellant left the bar with Popovich draped over his shoulder. Appellee had two alternative theories of what appellant did to Popovich after leaving Ledo's. The evidence implicated appellant under both theories.
 {¶ 84} Under the first theory, appellant's admission to Banks was sufficient to establish that appellant committed the murder, kidnapping, and attempted rape in his car outside Ledo's. Other evidence indicated that appellant took Popovich's body to the field on Smothers Road after committing these crimes. Popovich's body was found in the vicinity of a cell phone tower on Sunbury Road. The T-Mobile records custodian testified that appellant's cell phone registered off of the Sunbury Road tower at 3:42 a.m. on August 12, 2005, and T-Mobile engineer El-Fadli established that appellant was within two miles of the Sunbury Road tower when his cell phone registered off of that tower. Appellant admitted to Weatherspoon that he had been in the same area where Popovich was found, and appellant told Weatherspoon that his cell phone registered off of a tower in the vicinity of where Popovich was found. It is also significant that the area where appellant took Popovich was near his friend's uncle's home, a place appellant had been at least twice. *Page 35 
 {¶ 85} Under the second theory, appellant took Popovich to Smothers Road before the murder and attempted rape, as evinced by Popovich's body being found with her legs spread open, her hands above her head, her skirt on backwards, and her underwear torn.
 {¶ 86} Appellant also engaged in furtive conduct reflective of a consciousness of guilt. See State v. Hurst (Mar. 7, 2000), 10th Dist. No. 98AP-1549. Appellant told Banks that he cleaned his car after he had Popovich inside it. Appellant asked Damron to submit an anonymous tip to implicate another person in Popovich's death, and this other person matched the identity of Kline, appellant's friend. Appellant also tried to set up false alibis, and appellant wanted Mardis to harm witnesses and the prosecutors.
 {¶ 87} For all these reasons, we conclude that the evidence was sufficient to prove that he was guilty of murder, attempted rape, and kidnapping. Next, appellant argues that the evidence was insufficient to establish that appellant tampered with evidence. We disagree.
 {¶ 88} R.C. 2921.12 prohibits tampering with evidence, and provides:
 (A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]
The indictment alleged that appellant "did alter, destroy, conceal, or remove * * * a photo identification and/or body of Julie Popovich, with purpose to impair its value or availability as evidence in such proceeding or investigation." *Page 36 
 {¶ 89} Appellant argues that the evidence did not establish that he tampered with Brooks' identification card, which Popovich used to get into Ledo's before her disappearance. Appellant asserts that the identification card "was discarded in a location where it was likely to be found." Appellant is incorrect. The identification card was not discarded in an open and conspicuous place, but was concealed near a guardrail by some rocks on the east side of a bridge. The jury properly inferred that appellant was the one who concealed the identification card because the evidence placed appellant in the area at the time of Popovich's disappearance.
 {¶ 90} Appellant argues that the tampering with evidence statute does not apply when, as here, a body is left in a field. We disagree. A body constitutes a "thing" under R.C. 2921.12. State v. Blalock, 8th Dist. No. 80419, 2002-Ohio-4580, ¶ 73; State v. Canady (Apr. 16, 1992), 8th Dist. No. 60355.
 {¶ 91} Appellant also argues that he cannot be convicted of tampering with evidence in connection with Popovich's body because no affirmative act occurred. Appellant relies on State v. Wooden (1993),86 Ohio App.3d 23; and State v. Delaney, 3d Dist. No. 14-04-10, 2004-Ohio-4158. InWooden, the court concluded that a tampering with evidence conviction based on a missing gun was not supported by the evidence. Id. at 27. The court stated that "[m]any possibilities as to the whereabouts of the gun can be imagined, including the possibility that one of the other two suspects fled the scene with it in his possession." Id. InDelaney, the court concluded that a defendant could not be convicted of tampering with evidence when he dropped drugs on the floor in plain view in front of a police detective. Id. at ¶ 5-7. *Page 37 
 {¶ 92} Wooden and Delaney do not apply here. Appellant is the only person implicated in Popovich's death, and appellant concealed Popovich's body by leaving it in a field behind a shed with surrounding grass eight to ten inches high and out of sight from the road. Additionally, appellant told Banks that he concealed the body so that it would decompose and lose evidentiary value. Thus, the evidence was sufficient to prove that appellant was guilty of tampering with evidence.
 {¶ 93} In short, we conclude that appellant's convictions are based on sufficient evidence. We overrule appellant's third and fourth assignments of error.
 {¶ 94} In his fifth assignment of error, appellant argues that the trial court erred by overruling his motions for acquittal. A motion for acquittal focuses on the legal sufficiency of the evidence. City ofColumbus v. Myles, 10th Dist. No. 04AP-1255, 2005-Ohio-3933, ¶ 19. Appellant relies on his sufficiency of the evidence arguments from his third and fourth assignments of error, which we rejected. We conclude that the trial court did not err by overruling appellant's motions for acquittal, and we overrule appellant's fifth assignment of error.
 {¶ 95} In his sixth assignment of error, appellant argues that his convictions are against the manifest weight of the evidence. We disagree.
 {¶ 96} In determining whether a verdict is against the manifest weight of the evidence, we sit as a "thirteenth juror." Thompkins, at 387. We review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "`whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage *Page 38 
of justice that the conviction must be reversed and a new trial ordered.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, at 387, quoting Martin, at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, 10th Dist. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quoting State v. Long (Feb. 6, 1997), 10th Dist. No. 96APA04-511.
 {¶ 97} Appellant first argues against the credibility of the testimonies from Webb and Kimes. Appellant states that they were the only witnesses to testify that appellant left Ledo's with Popovich. Appellant notes that Skrzydlak and Kline, witnesses more familiar with appellant, testified that appellant did not leave the bar with Popovich. Unlike Skrzydlak and Kline, however, Webb and Kimes had not been drinking heavily when they saw appellant leave Ledo's with Popovich.
 {¶ 98} Appellant also notes that Kimes took 20 minutes to identify him in a photo array and that Webb was unable to make an identification during an initial array. Kimes took her time during the identification process because she wanted to be sure. Kimes verified at trial that she was 100 percent certain of her identification of appellant as the person who left Ledo's with Popovich. Webb sufficiently explained that he was unable to make an identification during an initial array because the array did not contain "a very good picture." (Vol. II Tr. 296.) As further evidence confirming the certainty of Webb *Page 39 
and Kimes identifying appellant, these witnesses described the shell necklace that appellant was wearing. Appellant wore the necklace during his interview with Dorn and indicated that he always wore it.
 {¶ 99} Appellant criticizes Webb for receiving a Crimestoppers reward, but the record does not indicate that the reward impacted his credibility. Instead, Webb's testimony is consistent with Kimes' testimony.
 {¶ 100} Appellant asserts that the times given by various witnesses indicated that Popovich was at Ledo's when she was said to have been leaving with appellant. Although there are discrepancies about the precise times of events for August 11 and 12, 2005, the evidence established that Popovich was not at Ledo's by the time the social gathering at the bar ended.
 {¶ 101} Next, appellant argues against the credibility of the jail informants' testimonies. Appellant contends that none of the informants heard appellant make an outright admission of guilt. We have already concluded above that the informants sufficiently implicated appellant in Popovich's death, however.
 {¶ 102} Appellant also argues that the informants provided information commonly available from the extensive news coverage of Popovich's disappearance. None of the inmates said that they based their testimonies from the news. Rather, Banks, Mardis, and Livsey specifically testified that they obtained information about Popovich's disappearance from appellant and not from news coverage, and Banks knew information that the news did not report. Several inmates also produced letters, which the FBI found contained appellant's writing. These letters implicated appellant in *Page 40 
Popovich's death by seeking to set up a false alibi and by seeking to direct suspicion to Kris Kline.
 {¶ 103} Appellant argues that the informants were not credible because they testified to obtain benefits from the prosecution. Banks, Livsey, Weatherspoon, Damron, and Roy stated that they had to testify truthfully to obtain their benefits, and these witnesses verified that they were testifying truthfully. Mardis denied obtaining a benefit from appellee. But even if Mardis did obtain a benefit, Mardis verified that he was testifying truthfully.
 {¶ 104} Appellant asserts that no physical evidence exists. Because appellant left Popovich's body in a field, appellee lost the ability to obtain physical evidence from her decomposed body. And the lack of physical evidence in appellant's car is consistent with appellant's habit of keeping his car clean and his admission to Banks that he cleaned his car after Popovich's death.
 {¶ 105} Appellant contends that evidence implicates Popovich's boyfriend, Rogers. Appellant notes that Rogers and Popovich had a volatile relationship and that Rogers was seen with an injured hand after Popovich's disappearance. Appellant notes that Rogers was using Popovich's car during the time of Popovich's disappearance, and Popovich indicated that Rogers was going to pick her up from Ledo's. However, police interviewed Rogers and nonetheless decided that appellant should be charged. The record does not establish that Rogers murdered, kidnapped, and attempted rape against Popovich, but as we have indicated, sufficient evidence establishes that appellant committed these crimes. *Page 41 
 {¶ 106} Appellant suggests that Popovich suffered a fatal injury from falling off the bar at Ledo's. Dr. Gorniak testified that, if Popovich died from a head injury, there would have been either a skull fracture or she would have immediately complained of pain, headache, and dizziness. Dr. Gorniak testified that she saw no skull fracture on Popovich, and witnesses testified that, after the fall, Popovich got up and was fine. Conversely, Dr. Gorniak surmised that Popovich died from strangulation or suffocation.
 {¶ 107} Appellant argues that the testimonies from him, his mother, and Benis demonstrate that he did not kill Popovich because he was not with her after he left Ledo's. These witnesses were inconsistent and unreliable, however.
 {¶ 108} Appellant offered conflicting information in his testimony and his interviews with police and the media. Appellant told the media that he left Ledo's alone, but appellant testified that he left Ledo's with a group of friends. Appellant did not mention to the police that he went to a grocery store for supplies for Benis, that his mother took his car keys or that he was home vomiting during the early hours of August 12, 2005. Appellant also told Kline that he was going home to "pass out," and he did not tell Kline, as he testified, that he left Ledo's to help his mother at her store. (Vol. VI Tr. 1122.)
 {¶ 109} Appellant's mother admitted to not telling investigators that she took appellant's keys and that appellant was home sick during the early hours of August 12, 2005. Appellant's mother also admitted that she provided different testimony to the grand jury. Additionally, appellant told Mardis that his mother was not providing a true alibi. *Page 42 
 {¶ 110} Appellant challenges the credibility of El-Fadli's opinion that appellant was within two miles of the Sunbury Road cell phone tower when he received a call at 3:42 a.m. El-Fadli based his opinion on his knowledge that cell phone towers in Franklin County have a maximum range of 1.5 to two miles. This testimony implicates appellant in Popovich's death because the Sunbury Road cell phone tower is in the vicinity of the area where Popovich's body was found.
 {¶ 111} Appellant contends that Levitan negated this testimony. Levitan recognized that the 3:58 a.m. call registered off of a Lane Avenue cell phone tower at Ohio State University, which is near appellant's apartment, and Levitan opined that appellant was also in the Ohio State University area during the 3:42 a.m. call. Levitan explained that appellant could not have received a cell phone call that registered from the Sunbury Road tower while near or driving from Popovich's body. Levitan also concluded that, if appellant was near the Sunbury Road tower during the 3:42 a.m. call, appellant would have had to have sped between 79 and 85 m.p.h. to have reached the 18.4 miles to the Lane Avenue tower for the 3:58 a.m. call. Alternatively, Levitan concluded that, if appellant received a call while near Popovich's body, the call would have registered off of a cell phone tower on Harlem Road, which was 1.3 miles from where Popovich's body was found. Appellant also argues that El-Fadli needed call detail records to testify about whether appellant's cell phone registered off the Sunbury Road tower during the 3:42 a.m. call.
 {¶ 112} We conclude, however, that it was within the jury's province to accept El-Fadli's conclusions over Levitan's. Unlike Levitan, El-Fadli completed an engineering *Page 43 
degree, and El-Fadli designed and maintained the cell phone towers discussed here. El-Fadli testified that, when he made his opinions, he had adequate information about the cell phone tower activity connected with appellant's phone at the time of Popovich's disappearance. The jury could reasonably believe El-Fadli's opinion that appellant was within two miles of the Sunbury Road tower during the 3:42 a.m. call and that no circumstances existed for appellant to have been in his apartment or generally near Ohio State University during the call. Levitan's admission that he was not familiar with Columbus and his inability to specify the location of the Ohio State University area further discredited his opinion about appellant's whereabouts after Popovich's disappearance.
 {¶ 113} Moreover, the jury could have concluded that appellant drove Levitan's estimated 79 and 85 m.p.h. from the Sunbury Road tower to the Lane Avenue tower between the 3:42 and 3:58 a.m. calls. The GPS that was put on appellant's car tracked him going over 100 m.p.h. several times, and appellant admitted to speeding habitually.
 {¶ 114} Likewise, although Levitan testified that the Harlem Road cell phone tower was 1.3 miles from where Popovich's body was found, the jury could reasonably infer that appellant received the 3:42 a.m. phone call while driving toward the Sunbury Road tower away from Popovich's body. While Levitan initially testified that the Sunbury Road tower could not have picked up a signal from appellant's cell phone if appellant was near or driving from Popovich's body, Levitan later clarified that, if appellant was driving down Sunbury Road from the eastern side of the tower, "[y]ou may have gotten a call, but it probably wouldn't have been a good call." (Vol. VII Tr. 1596-97.) *Page 44 
 {¶ 115} Lastly, appellant argues that no one measured the line-of-sight distance between the Sunbury Road tower and appellant's apartment, which was near Ohio State University. Appellant suggests that his cell phone could have registered off of the Sunbury Road tower from his apartment given a short line-of-sight distance. Because the line-of-sight distance is not in evidence, however, we need not entertain this speculative argument. See State v. Kelley (1991),57 Ohio St.3d 127, 130; State v. Ishmail (1978), 54 Ohio St.2d 402, paragraph one of the syllabus; State v. Robison, 5th Dist. No. 02 CA 00015, 2002-Ohio-7216, ¶ 44. Regardless, El-Fadli, who designed and maintained the Sunbury Road tower, testified that it was "impossible" that appellant was in the campus area when the 3:42 a.m. phone call registered off that tower. (Vol. VIII Tr. 1819.)
 {¶ 116} In the final analysis, the jury had ample evidence to logically conclude that appellant was in the Sunbury Road area, having left Popovich's body nearby, when his mother called at 3:42 a.m. Then, appellant was speeding home when his mother called again at 3:58 a.m.
 {¶ 117} For all these reasons, we conclude that appellant's convictions are not against the manifest weight of the evidence. We overrule appellant's sixth assignment of error.
 {¶ 118} In his seventh assignment of error, appellant asserts that the trial court erred by not merging the kidnapping and attempted rape convictions. We disagree. *Page 45 
 {¶ 119} We review the merger issue under the plain error standard because appellant did not raise it at trial. See State v. Williams, 10th Dist. No. 02AP-35, 2002-Ohio-4503, at ¶ 74 ("Williams II").
 {¶ 120} R.C. 2941.25 provides:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
 {¶ 121} R.C. 2941.25 requires a two-step analysis. State v.Cabrales, 118 Ohio St.3d 54, 2008-Ohio-1625, ¶ 14. "`In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses.'" Id., quoting State v. Blankenship (1988),38 Ohio St.3d 116, 117 (emphasis omitted).
 {¶ 122} Under the first step, the elements are compared in the abstract without consideration of the evidence in a particular case.Cabrales, at ¶ 22; State v. Rance, *Page 46 85 Ohio St.3d 632, 636, 1999-Ohio-291. The elements of the compared offenses need not exactly align for the offenses to be allied offenses of similar import. Cabrales, at ¶ 22. If the offenses are so similar that the commission of one offense will necessarily result in commission of the other, then the offenses are allied offenses of similar import. Id. at ¶ 26.
 {¶ 123} Pursuant to Count 5, appellant was convicted of attempted forcible rape under R.C. 2907.02(A)(2), which states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Pursuant to Count 4, appellant was convicted of kidnapping. The indictment tracked R.C. 2905.01(A)(2) and (4):
 (A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 * * *
 (2) To facilitate the commission of any felony or flight thereafter;
 * * *
 (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]
 {¶ 124} Appellee argues that kidnapping and attempted rape are not allied offenses. Appellee relies on State v. Laseur, 12th Dist. No. CA2002-10-117, 2003-Ohio-3874, In re Hardie, 4th Dist. No. 02CA55, 2003-Ohio-1388, and State v. Jacobs (July 16, 1986), 1st Dist. No. C-850842. These cases are inapposite; they did not *Page 47 
address merger, but addressed whether sufficient evidence supports attempted rape convictions.
 {¶ 125} Contrary to appellee's argument, kidnapping and attempted rape are allied offenses of similar import. State v. Fletcher (Nov. 25, 1987), 8th Dist. No. 52906. This comports with kidnapping and rape being allied offenses of similar import. Cabrales, at ¶ 25; State v.Adams, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 94.
 {¶ 126} The second step of the R.C. 2941.25 analysis is whether appellant committed attempted rape and kidnapping with separate animus. The syllabus to State v. Logan (1979), 60 Ohio St.2d 126, provides the following guidance:
 In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:
 (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
 (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.
 {¶ 127} Appellee alleged that appellant committed the kidnapping and attempted rape either near Ledo's or at Smothers Road, and the evidence establishes that appellant committed these crimes with separate animus under either scenario. We first *Page 48 
review the scenario of appellant committing the offenses against Popovich at the location where her body was found on Smothers Road. "`[W]here kidnapping is for the purpose of raping the victim at a future time or in a significantly different place, there is a different animus for each crime, the animus with respect to kidnapping being to engage in sexual activity with the victim in the future or at a different location.'" State v. Smith (May 12, 1988), 10th Dist. No. 87AP-300, quoting State v. Key (June 19, 1986), 10th Dist. No. 85AP-969. InSmith, separate animus for rape and kidnapping existed because the defendant transported the victim from the defendant's house to an abandoned building to commit the rape. In State v. Simmerman (Dec. 14, 1983), 9th Dist. No. C.A. No. 11252, separate animus for rape and kidnapping existed because the defendant transported the victim three to four miles to commit the rape. In State v. Lynch, 98 Ohio St.3d 514,2003-Ohio-2284, ¶ 135, separate animus to commit rape and kidnapping existed because the facts showed "substantial movement as [the defendant] lured [the victim] into his apartment and then moved her into his bedroom."
 {¶ 128} Here, to attempt forcible rape on Popovich at the location where her body was found, appellant would have transported the victim from Ledo's to the field on Smothers Road. Testimony establishes that this distance equaled 28 miles. Like Smith, Simmerman, andLynch, this transportation would constitute substantial movement underLogan and establish that appellant had a separate animus to commit rape and kidnapping. Secret confinement, another factor showing separate animus under Logan, also would have existed when appellant took Popovich to the field out of sight from Smothers Road. Therefore, under this scenario, separate animus existed. *Page 49 
 {¶ 129} We next address the scenario of appellant committing the offenses against Popovich near Ledo's. This scenario stems from appellant's admission to Banks that appellant and Popovich were at his car outside of Ledo's where Popovich resisted appellant's sexual advances, and Popovich died when appellant choked her.
 {¶ 130} In State v. Haynes, 10th Dist. No. 01AP-430, 2002-Ohio-4389, ¶ 114, we concluded that, under Logan, separate animus to commit rape and kidnapping existed where the defendant's restraint of the victim subjected her to a substantial increase and risk of harm separate and apart from the underlying rape. We noted that the victim was bound in a manner that "not only facilitated the rape, but must have substantially increased the danger of asphyxiation." Id. Here, like Haynes, while appellant restrained Popovich to commit the attempted rape, appellant would have choked Popovich and, therefore, subjected her to substantial increased harm apart from the underlying attempted rape. Thus, underLogan, the scenario that appellant described to Banks established that appellant committed rape and kidnapping with a separate animus.
 {¶ 131} Because appellant committed rape and kidnapping with separate animus under either scenario that appellee presented, we conclude that R.C. 2941.25 did not require the trial court to merge the offenses. SeeCabrales, at ¶ 14.
 {¶ 132} Next, appellant argues that the trial court needed to merge the kidnapping and attempted rape offenses under Blockburger v.United States (1932), 284 U.S. 299, 52 S.Ct. 180. Appellant argues thatBlockburger establishes the test as to whether punishments for multiple offenses violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. Appellant is incorrect. The Supreme *Page 50 
Court of Ohio has held that analysis under R.C. 2941.25 answers double jeopardy inquiries and renders application of Blockburger unnecessary.Rance, paragraph three of the syllabus. Accordingly, we find no double jeopardy violation here, given our conclusion under R.C. 2941.25 that appellant's attempted rape and kidnapping offenses do not merge.
 {¶ 133} For all these reasons, the trial court did not commit plain error by not merging appellant's attempted rape and kidnapping offenses. Therefore, we overrule appellant's seventh assignment of error.
 {¶ 134} In summary, we overrule appellant's seven assignments of error. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
KLATT and McGRATH, JJ., concur. *Page 1