[Cite as *State v. Mills*, 2022-Ohio-4010.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 110893 |
| v. | : | |
| KENNETH V. MILLS, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** November 10, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-645266-A

*Appearances:*

David Yost, Ohio Attorney General and Special Prosecutor
for Cuyahoga County, Matthew E. Meyer, Linda Majeska
Powers, and Daniel Kasaris, Assistant Attorneys General,
*for appellee.*

Flowers & Grube, Louis E. Grube, and Paul W. Flowers;
Kevin M. Spellacy, and Erin E. Hanson, *for appellant.*

CORNELIUS J. O'SULLIVAN, JR., J.:

{¶ 1} Defendant-appellant, Kenneth Mills, appeals his misdemeanor

convictions after a jury convicted him of two counts of falsification and two counts

of dereliction of duty. On appeal, he challenges the sufficiency of the evidence, the

trial court's admission of evidence of inmate deaths, the jury instructions, and the consecutive nature of his sentence. After a thorough review of the record and the law, we reverse and remand for a new trial, finding that the trial court erred when it allowed into evidence a photograph of a dying inmate and testimony about inmate deaths at the Cuyahoga County jail.

## I. Procedural History and Facts

{¶ 2} In October 2019, appellant was charged in a five-count indictment with the following: Count 1: tampering with records, a third-degree felony, in violation of R.C. 2913.42(A)(1) and (B)(4); Count 2: falsification, a first-degree misdemeanor, in violation of R.C. 2921.13 (A)(1); Count 3: falsification, a first-degree misdemeanor, in violation of R.C. 2921.13(A)(3); Count 4: dereliction of duty, a second-degree misdemeanor, in violation of R.C. 2921.44(C)(2); and Count 5: dereliction of duty, a second-degree misdemeanor, in violation of R.C. 2921.44(C)(5).

{¶ 3} In August 2021, the matter proceeded to a jury trial where over the course of three weeks, the jurors heard testimony from 30 witnesses and over 250 exhibits were admitted into evidence. The jury returned a verdict of not guilty as to the sole felony count in the indictment, Count 1, and guilty verdicts on the remaining counts. The trial court merged Count 2 into Count 3, and Count 4 into Count 5 and sentenced appellant to a consecutive nine-month jail sentence.

{¶ 4} In November 2009 (effective January 1, 2011), Cuyahoga County voters approved a charter amendment creating a county council and county executive;

Cuyahoga County became one of two out of 88 counties in Ohio not governed by a three-member commission. Following implementation of the county's charter amendment, many formerly elected positions became appointed positions, including that of county sheriff. Armond Budish ("Budish") was elected county executive for a term commencing in January 2015. At the start of his term, Budish directed every department to cut costs by ten percent and decided to regionalize the jails by accepting municipal prisoners into county custody.

{¶ 5} In early 2015, Budish appointed Clifford Pinkney ("Pinkney" or "Sheriff Pinkney") to the position of Cuyahoga County Sheriff. Shortly thereafter, in February 2015, Budish appointed appellant to a newly created position titled "Director of Regional Corrections." Appellant was to report to Chief Deputy Sheriff George Taylor, who reported to Pinkney.

{¶ 6} Appellant was hired with the mandate to regionalize the county jail.[1] Budish explained appellant's appointment in a press release:

> As Regional Director of Corrections, Mills will oversee emerging collaborations and potential consolidations with jails county-wide. He will also direct the operations of the Sheriff's Department County Jail after a long-term transition with the current, part-time County Jail Wardens. The Regional Director of Corrections position will become a self-sustaining position, with its salary offset over time by the revenue generated from jail regionalization. As Regional Director of Corrections, Mills will also ensure compliance with departmental policy and standards and assist with developing and managing the budget, among other responsibilities.

---

[1] Appellant replaced Kenneth Kochevar, who was a longtime county employee and the county's "Jail Director."

{¶ 7} Victor McArthur, former associate warden at the jail, testified that "[j]ail regionalization is when one jail, like the county jail, becomes the hub for all of the jails and all of the jails feed into county jail so inmates are processed one time instead of in every jail that they visit." Part of this plan, known as the "Cleveland Project," was designed to be a revenue generating plan where the county would house inmates from the city of Cleveland at the county jail for a daily fee of $99 per inmate.

{¶ 8} Appellant had a military background; he served in the Coast Guard. After retiring from the Coast Guard, he was hired by the county as director of public safety. As the director of public safety, appellant was the head of a medium-sized department that included 9-1-1 operators, a witness-victim program, and county emergency preparedness. Appellant did not, however, have any experience in corrections or law enforcement. Philip Angelo, who was a special assistant with the Cuyahoga County Sheriff's Office, testified that he was involved in appellant's interview process and reviewed his resume. According to Angelo, it "did not seem" like appellant had the training or qualifications to run a large jail, and Angelo ended up not recommending him for the position of regional director. Sheriff Pinkney also testified that he would not have hired appellant because he did not have law enforcement or correctional experience.

{¶ 9} On paper, the director of regional corrections reported to the sheriff, who in turn reported to the executive. Although appellant was to report to the

sheriff, the testimony reveals that appellant considered himself the sole overseer of the county's jails.

{¶ 10} It is undisputed that there have been ongoing problems with the county jail that predate appellant's employment. Two major issues central to this case were overcrowding and staffing. The county jail's capacity is approximately 1,765 inmates. Kochevar, appellant's predecessor, testified that the county jail has been overcrowded "[f]orever." Joel Commins ("Commins"), who has been employed as a jail inspector for the Ohio Department of Rehabilitation and Correction's Bureau of Adult Detention since 1998, has never "found the capacity to be under 1765." Former Cuyahoga County Jail Warden Eric Ivey testified that overcrowding and staffing had been issues "since I started back in 1990."

{¶ 11} The reasons for staffing issues were multi-faceted. Problems with staffing corrections officers were the result of high turnover and, in later years, a substantial number of call-offs every shift; Commins testified as many as 30-60 corrections officers would call off every shift. When a corrections officer called off his or her shift, the corrections officer still on duty would be made to work an additional four hours of overtime, which would lead that officer to call off his or her next shift. Cuyahoga County Deputy Inspector General Sicily Woods testified that turnover for corrections officers under appellant's leadership increased 118 percent between 2015 and 2018. She also testified that corrections officers made $15 per hour, one of the lowest paid hourly wages for corrections officers in the state of Ohio.

{¶ 12} The short staffing led to the practice of "red zoning," which, according to FBI Special Agent Daniel Eyer, is the locking down of inmates within their cells, at times for up to 20 hours a day. In these instances, one corrections officer would be responsible for supervising two to four housing pods, or as many as 192 inmates, instead of the 48 inmates in one pod that would be assigned to that officer under ideal operating conditions. According to the agent, "the forced lockdown of inmates into their cells had increased significantly after [appellant] had taken over."

{¶ 13} The staffing issues were not limited to corrections officers. Multiple witnesses testified that the jail never had enough nurses on staff. Earl Leiken, Cuyahoga County Chief of Staff from 2018-2019, testified that Margaret Keenan, director of the Cuyahoga County Office of Budget and Management ("OBM"), emailed him to request an increase in wages for nursing staff. Keenan explained that a nurse would make $28 per hour at the jail while the "industry standard" was $38 per hour. When the county hired temporary nurses to fill the gaps in the nursing staff, those nurses made the industry standard, which caused a "morale issue" among the permanent nursing staff. MetroHealth Hospital Executive Vice President of Administration and Chief of Staff Jane Platten explained at a May 22, 2018, Cuyahoga County Council Public Safety Committee Meeting that while MetroHealth staffed most of the medical positions at the county jail, the county alone controlled the staffing of nurses.

{¶ 14} Dr. Thomas Tallman was the county jail's medical director pursuant to a medical services contract between the county and MetroHealth. He testified

that he "constantly worked with [human resources]" in an effort to hire more nurses and raised the issue at monthly staff meetings.

{¶ 15} In late 2015 and early 2016, an issue arose with the provision of medical care to inmates at the county-run Euclid satellite jail. Dr. Tallman testified that the facility, which currently did not have medical staff, required a full-time nurse. Appellant told him that the current budget could not accommodate this change and corrections officers could do medical screenings, even though they were not trained to do so.

{¶ 16} On March 14, 2017, Dr. Tallman filled out a personnel request form for two full-time nurses at the Euclid jail, explaining that the additional staffing was

> mission critical based on the Regional Director of Corrections' request to maintain full inmate capacity at said facility. Furthermore, there have been several inmates identified with serious medical needs that were not immediately evaluated upon arrival to the jail facility.

{¶ 17} The personnel request form required the signatures of the department director, OBM, agency chief, and human resources. On March 21, 2017, Sheriff Pinkney signed off as the department director. Appellant, whose signature was not required on the form, discovered the personnel request form and emailed Dr. Tallman and OBM Director Keenan:

> [ ] just informed me that you have submitted a request for an RN at Euclid. Since you're aware that is not in the budget, nor do I deem an operational requirement, if you are transferring one of your current RN positions or vacancies, that's up to you, but there is no funding for any additional staff.

> Maggie [Keenan], * * * you always have the last say but I do not approve nor have the funding for this.

{¶ 18} Keenan responded that she would not approve the personnel request if a "director," meaning appellant, did not approve the request, even though appellant's superior, Sheriff Pinkney, had already signed off on the request. Dr. Tallman responded to Keenan's denial of funding as follows, in an email dated March 27, 2017:

> I am the Medical DIRECTOR [sic] and I did review this. Your response is disappointing but not a total surprise. My top priority is the health and safety of the inmates including those at Euclid. Now I have an e-mail that documents that funding was denied and I will reference this in the future, especially if there's a significant untoward event involving patient care at the Euclid Jail.

{¶ 19} The involved parties met to discuss the issue on March 30, 2017, after which Dr. Tallman sent an email to appellant, Sheriff Pinkney, Public Safety Chief Frank Bova, and Keenan, that stated: "In regards to Euclid, moving forward, [s]ince the Sheriff has the final word, as he stated, and he did sign off on the request for 2 RN's at Euclid, I anticipate this is moving forward." Appellant responded that there was no money in the budget to hire nurses and they could not hire nurses until the county started housing Cleveland inmates.

{¶ 20} In the agreement negotiated between the city of Cleveland and county administration, the county jail would accept "fresh arrests" from the city in return for $99 per day of confinement and a one-time payment of $5.6 million. County council considered and enacted the deal as a "revenue generating agreement," which took effect on September 26, 2017. It appears, however, that the county jail facilities were not ready to accept the additional intake responsibilities of as many as 40

additional fresh arrests a day, including intoxicated and violent people, and those with medical and mental health issues. Dr. Tallman informed appellant that "all necessary additional staff" needed to be "hired and in place before we assume responsibilities for healthcare operations" for the city of Cleveland. Appellant told Dr. Tallman that the jail needed to generate revenue from the inmates before the additional medical staff would be hired.

{¶ 21} The county also opened a satellite jail in Bedford Heights, commonly known as the Bedford jail, in May 2018. Testimony and email exchanges that were entered into evidence reveal that the medical staff was likewise concerned that there was not proper staffing of the Bedford jail.

{¶ 22} Conditions at the county jail worsened starting in March and April of 2018 as the fresh arrests from Cleveland overwhelmed the facility. Keenan testified "[i]n April 2018 there was absolutely no denying that we were in crisis." She explained:

> The temporary nurses were making much, much more than our nurses and so our nurses were quitting at an increased rate because they said you can pay [the temporary nurses] but you can't pay [the permanent nurses]. And we were just bleeding staff. And also meanwhile the population in the jail was going up, up, up. And they were Cleveland prisoners. And I mean, that's fine. But the Cleveland inmates come in with a host of problems that we had never seen before. So we can't afford to be short staffed when we are bringing in Cleveland inmates.

{¶ 23} When asked whose job it was to have planned for the new inmates, Keenan responded, "Ken Mills." Nursing Supervisor Gary Brack testified that at one point medical staff had not performed the required 14-day medical screenings on

800 out of 2,200 county jail inmates solely because they lacked the medical staff to complete the screenings.

{¶ 24} In May 2018, the Cuyahoga County Board of Control flagged a request for funding for temporary nurses and referred the matter to the Cuyahoga County Council's Justice Affairs Committee. Apparently concerned, County Councilmember Michael Gallagher invited members of the Sheriff's Department and "anyone that had anything to do with the medical [issues] in the jail" to attend the May 22, 2018 Cuyahoga County Council Public Safety Committee meeting. The meeting was recorded, played for the jury, and entered into evidence.

{¶ 25} During the meeting, Gallagher asked appellant if he had been the "blockade" to hiring nurses and whether hiring requests had gone across appellant's desk and stopped. Appellant replied, "That's not true, they don't come to me, that is absolutely not true. Hire requests do not come through me. They go through the Sheriff, and I can't overturn anything the Sheriff signs." Gallagher repeated: "So you have not blocked anything?" Appellant stated, "No, sir. I've never blocked hiring nurses to come into the jail."

{¶ 26} Conditions at the county jail continued to decline through 2018, and several inmates died by overdose or suicide. Finally, Budish asked the United States Marshals Service to investigate the county jail. On November 14, 2018, Budish met with appellant in advance of the release of the U.S. Marshal's report. Budish terminated appellant from his position as regional director of corrections.

**{¶ 27}** In 2020, the county closed both the Euclid and Bedford satellite jails and those inmates were transferred to the main jail.

## II. Assignments of Error

I. The trial court erred by failing to grant the Motion for Judgment of Acquittal as to the crimes of falsification and dereliction of duty because the State presented insufficient evidence to sustain a guilty verdict.

II. The trial court erred by permitting introduction of substantial evidence of other wrongs and bad acts in violation of Evid.R. 403(A) and 404(B).

III: The trial court erred by denying a request for a jury instruction requiring jurors to render unanimous verdicts.

IV: The trial court erred by deleting statutory language from a jury instruction explaining the offense of derogation of duty and permitting jurors to decide what the law required

V: The trial court erred by ordering the defendant to serve his misdemeanor sentences consecutively.

## III. Law and Analysis

### A. Sufficiency of the Evidence

**{¶ 28}** In the first assignment of error, appellant contends that there was insufficient evidence to support his convictions for dereliction of duty and falsification.

**{¶ 29}** Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). We examine the evidence in the light most favorable to the state and determine whether any rational

trier of fact could have found that the state proved, beyond a reasonable doubt, all the essential elements of the crime. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). In reviewing the sufficiency of the evidence, this court must not "'disturb the verdict unless [the court] determine[s] that reasonable minds could not arrive at the conclusion reached by the trier of fact.'" *State v. Dixon*, 8th Dist. Cuyahoga No. 110972, 2022-Ohio-2582, ¶ 20, quoting *State v. Saleh*, 10th Dist. Franklin No. 07AP-431, 2009-Ohio-1542, ¶ 81. "Reviewing courts do not evaluate witness credibility when reviewing the sufficiency of the evidence." *Dixon* at *id.* citing *Saleh* at *id.*

## 1. Dereliction of Duty – Appellant was an "Officer" Under the Statute

{¶ 30} Count 4 and Count 5 charged dereliction of duty under R.C. 2921.44(C)(2) and (C)(5), respectively. R.C. 2921.44(C) states:

> (C) No officer, having charge of a detention facility, shall negligently do any of the following:
>
> (2) Fail to provide persons confined in the detention facility with adequate food, clothing, bedding, shelter, and medical attention;
>
> (5) Fail to observe any lawful and reasonable regulation for the management of the detention facility.

{¶ 31} Appellant contends that the state failed to prove that he was an "officer"; therefore, he could not be convicted of dereliction of duty. Appellant does not dispute that he was in charge of jail; the record is replete with references to appellant's authority over the jail. Moreover, appellant stated in his brief on appeal that the sole issue of the dereliction-of-duty convictions is whether appellant is an

officer. Thus, we must determine whether the state provided sufficient evidence that appellant was an "officer" under the statute. We answer that question in the affirmative.

{¶ 32} Appellant contends that the term "officer" is akin to that of a law enforcement officer, one who has been appointed by the sheriff, has arrest powers, or has taken a sworn oath. The term "officer" is not defined in the statute. R.C. 2921.44(A) and (B), prohibit certain actions by "law enforcement officers," but appellant was charged under subsection (C), where the state legislature chose to use the more general term "officer."

{¶ 33} "In the absence of a definition of a word or phrase used in a statute, words are to be given their common, ordinary, and accepted meaning." *State v. Nelson*, 162 Ohio St.3d 338, 2020-Ohio-3690, 165 N.E.3d 1110, ¶ 18, quoting *State v. Black*, 142 Ohio St.3d 332, 2015-Ohio-513, 30 N.E.3d 918, ¶ 39. To this end, we observe that Black's Law Dictionary defines "officer" as "[s]omeone who holds an office of trust, authority or command." *Black's Law Dictionary* 1307 (11th Ed.2019). Because the term "officer" is not defined in the statute, we must utilize its plain and ordinary meaning to decide whether the state provided sufficient evidence that appellant held an office of trust, authority, or command.[2]

---

[2] We can also find guidance in R.C. 2921.37, which provides that "the person in charge of a detention facility has the same power as a peace officer to arrest a person who illegally conveys weapons or other prohibited items onto the grounds of specified governmental facility." Additionally, while the Ohio Administrative Code also does not define an "officer" as it relates to R.C. 2921.44; the "Glossary of Terms" in Chapter 5120:1-7 Bureau of Adult Detention provides:

{¶ 34} Appellant was appointed by Budish to the position of director of regional corrections. The government at the county level in Cuyahoga County is governed by a charter, which provides that the position of sheriff is appointed and the county executive has the power to "appoint, suspend, discipline and remove all county personnel." Cuyahoga County Charter Article XIV, Section 16.01, and Article II, Section 2.03(1). The county executive, through the human resources department, oversees the employment of the county's 550 civilian corrections officers — not the sheriff. Budish appointed appellant to "oversee emerging collaborations and potential consolidations with jails county-wide," "direct the operations of the Sheriff's Department County Jail," "ensure compliance with departmental policy and standards," and "assist with developing and managing the budget."

{¶ 35} Sheriff Pinkney testified that appellant was the "jail administrator." According to Pinkney, he began to have problems with appellant sometime in 2015 when appellant questioned why Pinkney was physically inside the county jail. Appellant went so far as to change the locks so Pinkney could not access the jail. Pinkney testified:

---

> (B) As used in rules * * * 5120:1-8-01 to 5120:1-12-18 of the Administrative Code, the following terms have the meanings indicated in this rule:
>
> (1) "Administrators and supervisors": Persons who have managerial responsibility for a full-service jail or who supervise employee security assignments or activities in the jail.

Ohio Adm.Code 5120:1-7-02(B)(1).

[Appellant] wanted to control the jail budget, which was 70 percent of the overall sheriff's office budget and he wanted to control that portion of the budget because he ran the jail.

{¶ 36} Pinkney testified that appellant was trying to separate his department from that of the county sheriff, so that he (appellant) could have total autonomy over the jail without interference from the sheriff. Pinkney did not feel as though he had authority to direct or discipline appellant, even though he was appellant's superior.

{¶ 37} Donna Kaleal, the county fiscal director, testified that appellant "was in charge of the county jail. * * * He was in charge of regionalizing some of the other jails within the city like the Bedford jail or the Euclid jail so he would be in charge of those jails. * * * [H]e was in charge of the inmates and the corrections center." Kaleal further testified that appellant "took over the entire budgeting process for the Cleveland Project."

{¶ 38} Considering the significant evidence that appellant had a position of trust, authority, or command over the Cuyahoga County jail, we find that the state provided sufficient evidence that appellant was an officer under the statute.

## 2. Falsification – Sufficient Evidence that Appellant Lied to County Council

{¶ 39} Next, appellant argues that the state failed to provide sufficient evidence that he made a false statement to county council. The crime of falsification requires:

(A) No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies:

(1) The statement is made in any official proceeding.

(3) The statement is made with purpose to mislead a public official in performing the public official's official function.

R.C. 2921.13(A)(1), (3).

{¶ 40} During the May 22, 2018 Cuyahoga County Council Public Safety Committee meeting, Councilmember Gallagher asked appellant if he had been the "blockade" to hiring nurses and whether hiring requests had gone across appellant's desk and stopped. Appellant replied: "That's not true, they don't come to me, that is absolutely not true. Hire requests do not come through me, they go through the Sheriff, and I can't overturn anything the Sheriff signs." Gallagher repeated, "So you have not blocked anything?" Appellant stated, "No, sir. I've never blocked hiring nurses to come into the jail."

{¶ 41} Roughly a year earlier, however, on March 14, 2017, Dr. Tallman filled out a personnel request form for two full-time nurses at the Euclid jail, explaining that the additional staffing was

> mission critical based on the Regional Director of Corrections request to maintain full inmate capacity at said facility. Furthermore, there have been several inmates identified with serious medical needs that were not immediately evaluated upon arrival to the jail facility.

{¶ 42} The personnel request form did not require appellant's signature and Sheriff Pinkney signed off as the department director. When appellant found out about the personnel request form, he emailed the involved parties and stated:

> [Y]ou have submitted a request for an RN at Euclid. Since you're aware that is not in the budget, nor do I deem an operational requirement, if

you are transferring one of your current RN positions or vacancies, that's up to you, but there is no funding for any additional staff.

Maggie [Keenan], * * * you always have the last say but I do not approve nor have the funding for this.

**{¶ 43}** Keenan replied to Dr. Tallman a short time later, telling him that she could not support staff requests that lacked appellant's approval. The parties eventually met, after which Dr. Tallman again emailed stating that it was his understanding that Sheriff Pinkney signed off on the request for nurses. Appellant disagreed, stating that that there was no money in the budget to hire nurses and they could not hire nurses until the county started housing Cleveland inmates.

**{¶ 44}** At trial, Keenan testified that she worked closely with appellant and allowed appellant to circumvent Sheriff Pinkney and go directly to her on issues that would "cut spending or raise revenue." When asked if appellant interfered with the hiring of nurses in any of the jail facilities, Euclid, Bedford, or the main jail, Keenan testified, "Yes."

**{¶ 45}** Sheriff Pinkney also testified that appellant interfered with the hiring of nurses at county jail. He testified that "once [appellant] was made aware that the request was made to hire nurses he didn't feel that there [were] nurses needed so he contacted OBM telling OBM not to hire the nurses, to deny this request."

**{¶ 46}** Appellant points to an April 2017 email Sheriff Pinkney sent stating that "we should hold off [on the hiring of nurses] until the Cleveland Project is done" as support for his position that Sheriff Pinkney made the hiring decisions and appellant had no authority to block the hiring of nurses. MetroHealth's Jane Platten

testified, however, that appellant "blocked the hiring of nurses" and the email was Sheriff Pinkney "agreeing [with appellant] to hold off" hiring the nurses. Platten testified:

Q. Dr. Tallman reports to whom?

A. Chief Deputy George Taylor.

Q. And the chief reports to whom?

A. Clifford E. Pinkney.

Q. So Dr. Tallman fills out a personnel request form?

A. Yes.

Q. The sheriff approves it?

A. Yes.

Q. Is Ken Mills in that particular chain of command?

A. No.

Q. But what does Ken Mills do on March 23rd, 2017?

A. He sends an e-mail saying there's no money in the budget and there's not a need for it.

{¶ 47} Brack testified he was employed from 2015-2018 with MetroHealth as a nursing supervisor working directly with the county jail. Brack testified that based on his personal knowledge, appellant "blocked the hiring of nurses." According to Brack, appellant contacted Keenan and told her "not to approve positions, not to fund those positions." He testified that appellant was the roadblock by "obstructing and not allowing us to hire" nurses.

**{¶ 48}** Finally, Dr. Tallman testified that he and Brack prepared a bullet pointed statement for county council. Dr. Tallman read the statement and it was entered into evidence as exhibit No. 117:

MetroHealth Correctional Health Program v. Ken Mills

For the past 2 years, Mills obstructed all attempts to increase staffing or improve operations, yet operational demands have increased exponentially.

Despite staffing shortages in the medical department, adding Euclid Jail, City Jail, and now Bedford Jail has further increased staffing demands. At no time has the medical department been a part of the meeting to plan and prepare for these additional demands.

In March 2017, Dr. Tallman submitted emergency staffing requests for two RN's to staff Euclid Jail, which the Sheriff signed off. Ken Mills and Maggie Keenan blocked it and refused to pay for it. To this day we have never had nursing staff devoted to the Euclid Jail and yet the inmate population is maintained at 60 - 70. This includes fresh arrests and inmates on medications: a huge liability.

When presented with data that supports the fact that altercations in the jail have increased in 2018, Mills refutes the facts. Frequent "red zoning" contributes to this increase in injuries sustained due to altercations.

Since Mills took over as regional director, he has redistributed correctional officers while subtracting the number of officers dedicated to the 6th floor dispensary.

The recent addition of inmates from the city jail has led to an intake increase > 100 percent, but we were provided zero additional staff to deal with this increase. Intake area is frequently overcrowded and unsafe.

The Bedford Jail recently came online without proper healthcare staffing in place. Go live dates were known for months in advance but never shared with the medical department. Healthcare staffing estimates initially submitted over 2 years ago, but completely ignored while at the same time, additional correctional officers were hired.

The medical department was told that there would be almost no perceived impact on healthcare operations when we started taking on city jail inmates. On the contrary, we have seen as many as 80 - 90 intakes coming in after 7 p.m. and not 1 additional RN was hired (as requested) in anticipation of this workload increase.

Decisions that impact the medical department including policies and procedures are constantly made and put into effect by Mills with no input from healthcare management.

{¶ 49} Looking at the evidence in a light most favorable to the state, there was sufficient evidence that appellant was not truthful when he told county council that he never blocked the hiring of nurses for the Cuyahoga County jails. Even disregarding what could be considered other witnesses' opinion of whether appellant told the truth at the meeting, the evidence shows that appellant consistently refused to allow the hiring of nurses while he told county council that he did not block said hiring. Thus, there was sufficient evidence to support appellant's conviction for falsification.

{¶ 50} The first assignment of error is overruled.

## B. Improper Admission of Evidence Regarding Deaths in the County Jail

{¶ 51} In the second assignment of error, appellant argues that the trial court improperly admitted evidence in contravention of Evid.R. 403(A) and 404(B).

{¶ 52} Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair

prejudice, of confusion of the issues, or of misleading the jury." Evid.R 404(B) provides:

> (B) Other crimes, wrongs or acts.
>
> (1) Prohibited uses. Evidence of any other crime, wrong or act is not admissible to prove the person's character in order to show that on a particular occasion the person acted in accordance with the character.

{¶ 53} "[T]rial court decisions regarding the admissibility of other-acts evidence under Evid.R. 404(B) are evidentiary determinations that rest within the sound discretion of the trial court." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 22. "Appeals of such decisions are considered by an appellate court under an abuse-of-discretion standard of review." *Id.* Likewise, when reviewing a trial court's decision to admit evidence pursuant to Evid.R. 403(A), "[t]he appropriate standard of review is the abuse of discretion standard." *State v. Wright*, 8th Dist. Cuyahoga No. 108026, 2019-Ohio-4460, ¶ 49. "'[T]he trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.'" *Id.*, quoting *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984). "In order for the evidence to be deemed inadmissible, its probative value must be minimal and its prejudicial effect great [when] viewed in a light most favorable to the proponent of the evidence[.]" (Citations omitted.) *Wright* at ¶ 50.

{¶ 54} An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary

authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse ""implies that the court's attitude is unreasonable, arbitrary or unconscionable."" *State v. Montgomery*, Slip Opinion No. 2022-Ohio-2211, ¶ 135, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). *See also State v. Acosta*, 8th Dist. Cuyahoga No. 111110, 2022-Ohio-3327, ¶ 43; *State v. Parker*, 8th Dist. Cuyahoga No. 110563, 2022-Ohio-377, ¶ 11.

**{¶ 55}** Appellant argues that the trial court (1) improperly allowed evidence that inmates died in the jail under appellant's leadership, and (2) improperly allowed evidence that appellant made negative personal comments about and treated jail medical corrections staff poorly.

**1. Admitted Evidence of Inmate Deaths**

**a. State's Opening Statement**

**{¶ 56}** From the first lines of the state's opening argument, the state discussed the deaths in the county jail. After briefly thanking the jury and explaining the purpose of opening arguments, the state launched into a lengthy story about the untimely death of Joseph Arquillo, who was only 48 years old when he died within the first eight hours of being booked into the county jail in August 2018. As told by the state:

> [A]t 3:00 a.m. in the morning of August 28th, 2018, sheriff's deputies booked a 48 year-old gentleman named Joseph Arquillo into the Cuyahoga County Jail. Like a lot of people in our society Mr. Arquillo was addicted to drugs. He was a Navy veteran who had been hooked on painkillers and when he was arrested, and we don't know exactly

when, but sometime near his arrest he ingested a quantity of opiates that would eventually cause him to overdose and die.

He was taken to a place in the jail known as the sally port. And you are going to see evidence in this case of what the jail looked like in 2018. What I'm showing you is where Mr. Arquillo ended up. It was an area of the jail known as the 3-G pod.

Now, Mr. Arquillo's overdose was not like what you see on TV. He suffered a slow-motion kind of death that lingered over eight hours where it was difficult for him to breathe. He was brought through the intake process, and he was never seen by a medical person. No one ever checked his blood pressure, no one ever asked for his medical history, no one asked if he was thinking of harming himself, no one asked if he had taken something that might hurt him.

He was taken up to that 3-G pod and left there and ignored where about eight hours later he died. * * *

Mr. Arquillo never got screened by a medical person. He bypassed that process entirely, went right up to the pod and he eventually died, ignored and alone, in this area of the jail where inmates — there were so many inmates, it was so overcrowded that people were sleeping on the floors.

So, what happened to Mr. Arquillo, how a routine probation violation arrest turned into a death sentence was part of an overall breakdown in safety conditions of 2018 that culminated in the deaths of the six people between June and December of 2018. You are going to hear testimony that deaths do occur in the jail. It's a tragic reality of operating a jail. It does happen. But you're also going to hear that they are relatively rare[,] and no one has ever seen[,] before or since[,] anything like the number of deaths that occurred in this jail between June and December of 2018.

As tragic as those deaths were though, many people who worked in the jail had predicted that they would happen. They also said the jail should have been able to prevent those deaths. They had warned the jails head administrator, a man named Ken Mills, the defendant in this case, who had the title of Director of Regional Corrections, that the things he was doing to manage the jail would get people hurt or killed.

{¶ 57} During opening argument, the state also mentioned the death of well-known Cleveland native rhythm & blues singer Sean Levert, who died in the Cuyahoga County jail in 2008, ten years prior to appellant's appointment as Regional Director. Levert's death is mentioned by witnesses numerous times throughout trial.

**b. Deputy Inspector General's Testimony**

{¶ 58} Deputy Inspector General Woods testified that the Cuyahoga County Inspector General initiated an investigation into the conditions in the jail due to the multiple deaths occurring in the jail and assigned Woods to be the lead investigator. Woods testified from her report:

> In 2018 eight citizens died after entering the Cuyahoga County Correctional Center or CCCC. In September, 2018 in response to the first four deaths the Agency of Inspector General, AIG, initiated an investigation into the conditions of the county jail. Later that month after the deaths of two more detainees, the county executive, as required by County Code section 204.01, the AIG suspended its investigation in order to avoid any interference with the federal review.

**c. County Councilmember's Testimony**

{¶ 59} As to the deaths in the jail, Councilmember Gallagher testified:

Q. And ha[d] events occurred in the Cuyahoga County Jail between June of 2018 and December of 2018 that could render the county liable?

A. If I'm correct, I think we have a death.

Q. How many?

A. I remember the first one. It was soon after this meeting. And might have been two up until that time. Unfortunately, they run together.

Q. Do you remember about six or eight of them?

A. That was a string I think over a period of time.

### d. OBM Director's Testimony

{¶ 60} OBM Director Keenan testified regarding the 2008 death of Sean Levert:

A. * * * A shortage of nurses creates risk. The county settles a lot of medical-related lawsuits, the most significant of course was the Levert death. * * * Sean Levert was an inmate in the county jail and he passed away in the county jail from — I believe it was withdrawal and the county settled — so the county was sued for wrongful death and the county settled that lawsuit.

Q. How much did it cost the taxpayers[,] if you know?

A. $5 million.

### e. Sergeant's Testimony

{¶ 61} Cuyahoga County Sheriff's Sergeant Mark Thevenin identified exhibit No. 165; a picture taken from the jail's security camera in the 3-G pod; the picture was entered into evidence. One of the men in the picture is Arquillo, who was sitting on the ground bent over, but still alive. Sgt. Thevenin testified as follows:

Q: I'm going to show you a picture which we've marked as Exhibit 165 * * *.

A. That would be the third floor.

Q. Okay. So that is what exactly? Do you recognize that image?

A. This is Arquillo * * *.

Q. Is that an inmate?

A. That is Arquillo. I believe this is the day he passed away. He pretty much [overdosed] down there. * * * So when he's down here passing away, if you're not making the round or moving through here you'll never know because you can't see him there. * * *

Q. So on August 28th of 2018 did you respond to this scene in the 3-G dorm?

A. Yeah. There was a medical emergency called in that area. So I was the — I say, I was the admin sergeant in Jail 1. I responded with other corporals and sergeants. * * *

Q. Did the jail security camera record the date and time the image would have been recorded?

A. Yes, sir.

Q. Can you just read the date and time?

A. 8-28-2018. Says, 11:34 a.m.

### f. Brandon Kiekisz

{¶ 62} Brandon Kiekisz died by suicide in the Cuyahoga County jail on December 27, 2018, after appellant was terminated from his position. Although no one mentioned Kiekisz by name as an inmate who had died in the jail, Corrections Officer Rob Marsh testified that Kiekisz was not screened by the medical staff. Dr. Tallman also testified Kiekisz was not screened by medical staff and that "after the event with Kiekisz," he decided to move medical intake from the seventh floor back down to the sally port where inmate intake occurred.

### g. Exhibit No. 165

{¶ 63} Exhibit no. 165 was an image taken from the county jail's security camera, that showed Joseph Arquillo sitting on the floor, folded over his mattress, shortly before he died.

### 2. State's Justification for Admitting Evidence of Inmate Deaths

{¶ 64} The state argues that the evidence of jail deaths had "direct and probative value" to the dereliction-of-duty charges and were part of the "background evidence inextricably linked with the breakdown in jail conditions that led to the dereliction of duty charges." Appellee's brief, p. 20. The evidence of inmate deaths, the state posits, was also admissible to show the background of the crimes with which appellant was charged, or because the other acts were "inextricably related to those crimes." *Id.*, citing *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994).

{¶ 65} The state further argues that (1) appellant separated medical screening from the booking process, believing that corrections officers — not nurses — should perform the medical screenings, which caused the jail to overlook injured and highly disturbed inmates during booking; (2) appellant had been warned that inmates would die without adequate medical staff or medical care; and (3) the direct byproduct of appellant's decisions led to the jail's failure to medically care for inmates like Arquillo, who were experiencing life-threatening problems during intake. Thus, according to the state, the jail deaths were highly probative to demonstrate the consequences of appellant's interference with jail medical

decisions, which in turn directly went to the issue of whether appellant negligently failed to provide inmates with adequate medical care. Finally, the state argues that the 2018 jail deaths explained why the county asked the U.S. Marshals Service to investigate the jail, and why appellant was the "public official most responsible for the resulting outcome."

### 3. Admission of Prejudicial Evidence Deprived Appellant of a Fair Trial

{¶ 66} The admissibility of other acts evidence is carefully limited because of the substantial danger a jury will convict a defendant solely because it assumes the defendant has a propensity to commit criminal acts or deserves punishment regardless of whether he or she committed the crime charged in the indictment. *State v. Hernandez*, 8th Dist. Cuyahoga No. 108265, 2019-Ohio-5242, ¶ 37. The dissent contends that Evid.R. 404(B) is inapplicable to this case. Even if we were to assume without accepting that Evid.R. 404(B) does not apply, Evid.R. 403 excludes relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. We find that any evidence of inmate deaths, whether admitted pursuant to Evid.R. 403 or 404(B), was inadmissible.

{¶ 67} Having found that the trial court erred in allowing the evidence of inmate deaths, we must determine whether that error is harmless. Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless-error standard of review, the state "bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-

297, 802 N.E.2d 643, ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In most cases, in order to be viewed as "affecting substantial rights," "'the error must have been prejudicial[.]'" (Emphasis deleted.) *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *Olano* at 734. Accordingly, Crim.R. 52(A) requires a determination of whether the rights affected are "substantial" and, if so, whether a defendant has suffered any prejudice as a result. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 24-25.

{¶ 68} In *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, the Ohio Supreme Court reiterated the three-part analysis established previously in *Morris* to guide appellate courts in determining whether the erroneous admission of evidence affected the defendant's substantial rights so as to require a new trial or whether the admission of that evidence was harmless error under Crim.R. 52(A):

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. * * * Second, it must be determined whether the error was not harmless beyond a reasonable doubt. * * * Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.

*Harris* at ¶ 37, citing *Morris* at ¶ 27-29. Thus, we look at whether these multiple, combined errors had an impact on appellant's guilty verdicts, whether those errors were not harmless beyond a reasonable doubt, and, once the prejudicial evidence is taken out, is there overwhelming evidence of appellant's guilt?

**{¶ 69}** During opening argument, the state told the jury that appellant was warned that "people were going to die" in the jail. Defense counsel objected and the court overruled the objection, telling the jury, "Mr. Mills is not charged with causing any specific death or injury to any specific inmate." Before the state's 11th witness, Sgt. Thevenin, took the stand, the court determined that it would allow testimony of inmate deaths "on a limited basis" to show that some inmates had not been medically screened when they entered the jail. Although the court instructed the state to be cautious, the court still allowed the state to enter into evidence an image showing Arquillo, bent over on the ground, shortly before he died (State's exhibit No. 165). The court also allowed a significant number of witnesses to provide testimony about inmate deaths that occurred both while appellant was regional director and while he was not even employed by the county.

**{¶ 70}** Only after *14* of the state's witnesses had testified, did the court finally decide that it would no longer allow witnesses to utter the word "death" or testify that inmates died while in the county jail. At this juncture, the trial court issued a limiting instruction to the jury that appellant was not charged with causing the death of any inmate:

> Kenneth Mills is not charged with causing the death of any particular inmate. There were policy changes that he made that the evidence has shown already in terms of screenings done or not done. But that does not transfer to, because a screening was done or not done that that was the cause of the inmate's death. That inmate may have died anyway. So he's not charged with any death as a result that happened in the jail. So I want to reemphasize that point to you and I'm instructing you to consider that also in light of the testimony.

**{¶ 71}** "In a case where the evidence is of a particularly inflammatory nature, a curative instruction may be insufficient to cure the prejudicial effect." *Hernandez*, 8th Dist. Cuyahoga No. 108265, 2019-Ohio-5242, at ¶ 37, citing *State v. Patterson*, 5th Dist. Stark No. 2017CA00022, 2017-Ohio-8970. The above instruction alone leaves open the suggestion that appellant is not "charged" with any particular death but is responsible for all of them.

**{¶ 72}** From opening statement through the testimony of several witnesses, the state was able to introduce significant prejudicial testimony and evidence of multiple inmate deaths, even though appellant was not charged with any crime in connection with their deaths. We find the security camera image of Arquillo to be a most egregious and prejudicial piece of evidence and the state's reason for its admission incredible. Sgt. Thevenin testified that Arquillo was still alive when the security camera captured the image the state entered into evidence as state's exhibit No. 165. In opening arguments, the state said that Arquillo died approximately eight hours after being taken into custody at 3:00 a.m. on August 28, 2018. According to Sgt. Thevenin, the time stamp on the image is 11:34 a.m., eight and one-half hours after Arquillo was booked into the jail. Thus, while Arquillo may have still been alive while the image was taken, the image was captured very close in time to when he passed away.

**{¶ 73}** Despite this, the state argues that the image was "highly probative evidence both of overcrowding conditions and the lack of proper medical care," and the dereliction-of-duty charges "accused [appellant] of negligently failing to provide

inmates with adequate bedding, shelter[,] and medical attention." "Images from the Arquillo incident showed the profound levels of overcrowding that caused inmates to have to sleep on the floor." Appellee's brief, p. 20.

**{¶ 74}** The state's argument that it introduced the security camera image into evidence to show jail overcrowding lacks credibility. The image shows a rather large space with three men, including Arquillo, on mattresses on the floor, and a small group of other men in another area of the room. If the state wanted to show that the jail was overcrowded, there was ample other testimony to support its argument. Nursing Supervisor Brack testified that state's exhibit No. 170 showed the third-floor housing unit, where he observed mats and inmates on the floor. Deputy Inspector General Woods testified that in the same housing unit, inmates would have to sleep with their head or feet under toilets because the jail was so crowded. She further testified that in other areas of the jail, a single occupancy cell would have two inmates in it and these inmates were often locked in their cells for 20 hours a day due to staffing issues. As to the state's proposition that the image was probative to show the lack of proper medical care, the trial was replete with testimony that inmates did not receive proper medical care due to the shortage of medical staff, namely nurses.

**{¶ 75}** State's exhibit No. 165 had little to no probative value; it was used solely to inflame and improperly influence the jury — the fact that it showed a dying inmate and witnesses testified about this inmate's death was decidedly prejudicial and we cannot say beyond a reasonable doubt that the error was harmless.

**{¶ 76}** Considering the testimony about Brandon Kiekisz, although the testimony may not have been in and of itself reversible error, we do not consider the testimony about him in a vacuum. We consider the testimony in light of the other inadmissible testimony and evidence admitted at trial. In doing so, we also cannot find beyond a reasonable doubt that the testimony cited above, and the statements given by the state in opening arguments regarding inmate deaths, were not harmless beyond a reasonable doubt.

**{¶ 77}** Next, we consider whether the remaining evidence provided overwhelming evidence of guilt and if the prejudice to appellant was so overwhelming as to outweigh the evidence against him. Although the evidence as to the dereliction of duty counts was strong, especially in light of the fact that appellant only contested whether he should be considered an "officer," we find that the evidence supporting the falsification counts was less so.

**{¶ 78}** The dissent focuses on the third prong of *Harris* and finds that the evidence of appellant's guilt is "so overwhelming" and the prejudicial effect of the inmate deaths is "so insignificant" by comparison that, coupled with the court's limiting instructions, any error was harmless. There may have been sufficient evidence to support appellant's convictions, but the evidence was not "so overwhelming" as to overcome the pervasive and highly prejudicial testimony of inmate deaths. From the first minutes of trial until the court finally realized, 14 witnesses into the case, that the state was tainting the jury, the court allowed the

state to dramatically describe deaths of inmates before, during, and after appellant's tenure as regional director of corrections.

{¶ 79} There is no dispute the conditions of the Cuyahoga County jail were deplorable, and that "red zoning" was used. The state's case, however, centered around the inmate deaths. Contrary to the dissent's position that the state entered evidence of three inmate deaths, the state entered evidence of at least *nine* inmate deaths. The state began its opening argument discussing, in length, the death of inmate Arquillo. The state informed the jury "you're also going to hear that [inmate deaths] are relatively rare[,] and no one has ever seen[,] before or since[,] anything *like the number of deaths that occurred in this jail between June and December of 2018.*" (Emphasis added.) While only three inmates were referred to by name, Deputy Inspector General Woods testified that eight inmates died in the jail in 2018. Councilmember Gallagher testified that there was a string of deaths from June to December 2018. Multiple witnesses mentioned the 2008 death of Sean Levert. Thus, the number of inmate deaths the jury heard about was at least nine.

{¶ 80} Although the trial court gave minimal limiting instructions, the inherently prejudicial nature of the state's opening argument, witness testimony, and the photograph cannot be cured by a limiting instruction. *See State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, ¶ 39 (noting that a limiting instruction was insufficient to overcome the prejudice of the improperly admitted evidence); *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 50 (French, J., concurring in judgment only) (explaining that a limiting instruction

does not guarantee admissibility when the danger of unfair prejudice substantially outweighs the evidence's probative value).

{¶ 81} Finally, we note that the conduct of the prosecutor "may combine with an evidentiary error to cause greater impact." *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 31 (finding state's use of gruesome slides during the penalty phase appealed to the jury's emotions and prejudiced the defendant). "[B]latent prejudice may override even a strong case and require a new trial." *Id.* at ¶ 32. *See also State v. Ferricci*, 8th Dist. Cuyahoga No. 110208, 2022-Ohio-1393 (finding that the state's repeated statements in closing arguments that its expert had been previously retained by the defense unduly prejudiced the defendant). In this case, the state's repeated mentions of inmate deaths and use of witness testimony and exhibits to bolster its case under a theory of supporting its dereliction-of-duty charges was prejudicial to appellant.

{¶ 82} In sum, the discounted probative value of the state's evidence was substantially outweighed by the danger of unfair prejudice and the minimal limiting instructions the trial court gave to the jury were insufficient to overcome the admission of inadmissible evidence of inmate deaths. *See Creech* at *id.*

{¶ 83} Even though we find that there was sufficient evidence that appellant knowingly made a false statement to county council and made that false statement with purpose to mislead the council, after a thorough review of all the evidence in this case, this court concludes that there is at least a "reasonable possibility" that the

improper evidence admitted at trial contributed to appellant's conviction. *See Morris* at ¶ 28; *see also Ferricci* at ¶ 88.

## C. Witness Testimony Regarding Appellant's Attitude

{¶ 84} Finally, appellant contends that the trial court abused its discretion when it allowed in the following testimony: (1) appellant hated a particular nurse and was glad when he resigned; (2) Deputy General Inspector Woods's testimony that there was a "hostile work environment and a culture of disrespect" in the jail; (3) appellant once said a "monkey could do the job" of a corrections officer; (4) Sheriff Pinkney's testimony that appellant once ignored a corrections officer's morning greeting.

{¶ 85} We have reviewed the challenged testimony and find that any error in admitting it was harmless beyond a reasonable doubt.

{¶ 86} We therefore sustain the second assignment of error and reverse and remand for a new trial.

## D. Conclusion and Remaining Assignments of Error are Moot

{¶ 87} The trial court abused its discretion by allowing into evidence substantial argument, witness testimony, and photographic evidence regarding multiple deaths in the Cuyahoga County jail that occurred before, after, and while appellant was the regional director of corrections. The admission of the evidence was not harmless but was prejudicial to appellant and we conclude that there is a reasonable possibility that the improper evidence contributed to his conviction; therefore, the error was not harmless. Even if the remaining evidence established

appellant's guilt beyond a reasonable doubt, the blatant prejudice to appellant warrants a new trial.

{¶ 88} We therefore sustain the second assignment of error and reverse and remand for a new trial.

{¶ 89} Based on our sustaining the second assignment of error, the third and fourth assignments of error, which challenge the jury instructions, and the fifth assignment of error, in which appellant challenges the consecutive nature of his sentence, are moot. *See* App.R. 12(1)(a)(c).

{¶ 90} Judgment reversed; case remanded for a new trial.

{¶ 91} It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
CORNELIUS J. O'SULLIVAN, JR., JUDGE

EMANUELLA D. GROVES, J., CONCURS;
LISA B. FORBES, P.J., DISSENTS IN PART AND CONCURS IN PART (WITH SEPARATE ATTACHED OPINION)

LISA B. FORBES, J., DISSENTING IN PART AND CONCURRING IN PART:

{¶ 92} I respectfully dissent from the majority opinion sustaining Mills's second assignment of error and would find that the trial court acted within its discretion by admitting evidence of inmate deaths pursuant to Evid.R. 403(A).

{¶ 93} As noted by the majority, appellate courts review the admissibility of evidence for an abuse of discretion. *See State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 171. The Ohio Supreme Court recently clarified the abuse of discretion standard of review in *Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 33-41, explaining that, when a trial court abuses its discretion, "the trial court's attitude, in reaching its decision, was arbitrary, unreasonable, or unconscionable." (Citations omitted.)

{¶ 94} First, I would find that Evid.R. 404(B) is inapplicable to the case at hand. The Ohio Supreme Court has stated that Evid.R. 404(B) "prohibits the use of evidence related to *other acts of the defendant* to show his character or propensity to commit crimes * * *." (Emphasis added.) *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 3. The fact that inmates died is not other acts evidence as envisioned by Evid.R. 404(B). *See, e.g., State v. Heineman,* 2016-Ohio-3058, 65 N.E.3d 287, ¶ 76 (8th Dist.), quoting *State v. Patton*, 74 Ohio App.3d 224, 229, 598 N.E.2d 777 (3d Dist.1991) (defining the word "act" in the context of Evid.R. 404(B) as "'[t]he process of doing something; action: * * * something that is done or performed; deed * * *'"). In the case at hand, there is no evidence of an "act," let alone an "act" by Mills, that would implicate Evid.R. 404(B).

{¶ 95} Turning to Evid.R. 403(A), I would find that the evidence presented to the jury relating to inmate deaths is relevant to whether Mills violated R.C. 2921.44(C), which governs dereliction of duty. *See also* Evid.R. 401. Furthermore, the probative value of this evidence outweighs "the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶ 96} Notably, "[t]he exclusion of relevant evidence under Evid.R. 403(A) requires more than mere prejudice, because anything adverse to a party's case could be deemed prejudicial to that party." *State v. Worley,* 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 125. "[O]nly evidence that is *unfairly* prejudicial is excludable." (Emphasis sic.) *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 23. "'Unfair prejudice,' as used in Rule 403, does not mean the damage to the [party's] case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *U.S. v. Mendez-Ortiz,* 810 F.2d 76, 79 (6th Cir.1986). "'Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.'" *Oberlin v. Akron Gen. Med. Ctr.,* 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001), quoting Weissenberger's *Ohio Evidence*, Section 403.3, 85-87 (2000). Evidence may be unfairly prejudicial, "'if the evidence arouses the jury's emotional sympathies, invokes a sense of horror, or appeals to an instinct to punish * * *.'" *Id.*

**{¶ 97}** In its effort to prove Mills committed dereliction of duty under R.C. 2921.44(C)(2) and (5),[3] the state presented an abundance of evidence over an 11-day trial, including 28 witnesses and over 200 exhibits. A small part of this evidence concerned inmate deaths. In particular, three inmates who died were mentioned by name. One death occurred before Mills was appointed, one occurred during his tenure, and one occurred soon after he was terminated.

**{¶ 98}** According to the state, evidence of the death that occurred prior to Mills's tenure was presented to demonstrate that the jail began its partnership with MetroHealth for medical services to help prevent drug overdoses at the jail and provide better medical care to the inmates. In my opinion, this evidence is relevant background information to understand jail operations.

**{¶ 99}** According to the state, evidence of the deaths that occurred during and immediately after Mills's tenure was presented to demonstrate that Mills "was derelict in his duty" under R.C. 2921.44(C). Specifically, the state argued that inmates missed medical intake screenings as

> a result of * * * Mills bringing in the Cleveland inmates and overwhelming the intake process without increasing the staffing medical and officers, corrections officers. And number two, the result of backlog that resulted in people missing those [medical] intakes and going right to the housing unit with the conditions that lead to their deaths.

---

[3] Dereliction of duty is defined, in part, as the failure "to provide persons confined in the detention facility with adequate food, clothing, bedding, shelter, and medical attention" or the failure "to observe any lawful and reasonable regulation for the management of the detention facility." R.C. 2921.44(C)(2) and (5).

In my opinion, this evidence is relevant to whether Mills failed in his duties as the director of regional corrections to provide jail inmates with, among other things, adequate "medical attention."

{¶ 100} Furthermore, I would find that this evidence is not so unfairly prejudicial as to result in an improper basis for a jury decision. The state's evidence regarding inmate deaths, including comments made during opening statements, did not result in an improper basis for a jury decision because of the overwhelming evidence that Mills failed in his duties as the director of regional corrections. *See Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) ("In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the [improperly admitted evidence] is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper * * * admission was harmless error.").

{¶ 101} For example, as noted by the majority opinion, "the trial was replete with testimony that inmates did not receive proper medical care due to the shortage of medical staff, namely nurses." Additionally, the state presented testimony that the jail was "[d]irty, no running water, the inmates had to drink out of Igloo jugs. A lot of them slept on the table, on the floor. It was not clean at all." Testimony showed that, according to jail standards, "for every 12 inmates there has to be one shower and that shower has to be working * * *." The state presented testimony regarding the third floor of the jail, colloquially referred to as the "dungeon," was where all of the "fresh arrests" were placed, so that "all inmates would go immediately to * * * be

housed there." However, the plumbing was not working on the third-floor housing unit of the jail, so "there's no availability to take a shower," and the toilets would not flush. Testimony showed that conditions on the third floor, were "horrific," and "[n]o one should have been down there."

{¶ 102} A jail inspector for the state of Ohio testified to the following: when he inspected the Cuyahoga County jail between 2015 and 2018, he worked with Mills, who was the "jail administrator"; inmates were being isolated up to 20 hours per day; nonviolent and violent offenders were not being properly separated; and the jail was "exceeding [its] bureau recommended capacity by bunking additional inmates in single occupancy cells, double occupancy [c]ells, triple and quadruple occupancy cells." The inspector further testified that the term "red zoning" was developed by the Cuyahoga County jail, and he was not aware of any other jail in Ohio using this draconian method. "Red zoning" refers to locking inmates in their cells for extended periods of time because of understaffing. He further testified that, although "red zoning" did not meet basic jail standards, Mills's position was that the jail was "in compliance with all related Ohio Revised Code requirements." The inspector testified that he did not agree with Mills's position.

{¶ 103} Furthermore, the trial court was acutely aware of the possibility of unfair prejudice that could result from the "inference" that the inmates died because they were not medically screened. As a result, initially, the trial court limited the state's use of the evidence of inmate deaths to whether the medical screenings were "missed because of the change in policies and procedures that [Mills] caused." The

court informed the jury during the state's opening statement that "Mills is not charged with causing any specific death or injury to any specific inmate." The court instructed the jury that "whether * * * [the inmates] got screened or not they may or may not have died anyway."

{¶ 104} Approximately halfway through trial, the court clarified, out of the jury's presence, that it would not permit testimony that would raise an inference that the inmate died because the inmate did not get medically screened under Mills's change in procedure. Before resuming witness testimony, the court reminded the jury that "Mills [was] not charged with causing the death of any particular inmate." The court stated that Mills made policy changes regarding medical screenings, but whether an inmate was medically screened or not, "[t]hat inmate may have died anyway." No additional evidence related to inmate deaths at the jail was admitted at trial.

{¶ 105} Therefore, in my opinion, the admission of the inmate death evidence, coupled with the court limiting its use and issuing limiting instructions to the jury, was not unfairly prejudicial to Mills.

{¶ 106} In light of the overwhelming evidence against Mills and the limitations put in place by the trial court, I would find the court did not abuse its discretion when it permitted evidence related to inmate deaths. Therefore, I would overrule Mills's second assignment of error and proceed to analyze assignments of error Nos. 3 through 5. Otherwise, I concur with the remainder of the majority's opinion.